Gaspar Eugenio Jimenez ESCOBEDO, Petitioner-Appellant,

v.

UNITED STATES of America, Respondent-Appellee.

Gustavo CASTILLO, Petitioner-Appellant,

v.

Donald D. FORSHT, U. S. Marshal, Respondent-Appellee.

Nos. 79–1480, 79–1490.

United States Court of Appeals, Fifth Circuit.

Aug. 14, 1980.

John H. Lipinski, Miami, Fla., for Escobedo.

R. Jerome Sanford, Asst. U. S. Atty., Miami, Fla., Murray R. Stein, U. S. Dept. of Justice, Washington, D. C., for United States.

Weiner, Tunkey, Robbins, & Ross, P. A., Jeffrey S. Weiner, Miami, Fla., M. Cherif Bassiouni, Chicago, Ill., for Castillo.

Before MORGAN, ANDERSON and RANDALL, Circuit Judges.

R. LANIER ANDERSON, III, Circuit Judge:

This is an appeal from orders denying requests for *habeas corpus* relief in international extradition proceedings. On December 8, 1977, the Government of Mexico, pursuant to the United States-Mexico Extradition Treaty of 1899 [1], requested extradition of two United States citizens, Gaspar Eugenio Jimenez Escobedo and Gustavo Castillo (petitioners), for prosecution on charges of murder, attempted murder, and attempted kidnapping. In response to this request, petitioners were arrested in the Southern District of Florida. After holding an evidentiary hearing under 18 U.S.C.

---

1. Treaty of Extradition Between the United States of America and the United Mexican States, Feb. 22, 1899, 31 Stat. 1818, T.S. 242 [referred to herein as Extradition Treaty]. A new extradition treaty which entered into force on January 25, 1980, has superceded the 1899 Treaty. 17 *Int'l. Legal Materials* 1068 (1978). However, Art. 22(2) of the 1980 Treaty provides that, "Requests for extradition that are under process on the date of the entry into force of this Treaty, shall be resolved in accordance with the provisions of the Treaty of 22 Feb. 1899 [as supplemented]." Therefore, this extradition request, which has been in process since 1977, is governed by the 1899 Treaty.

§ 3184 [2], a United States Magistrate, on May 31, 1978, issued a Certificate of Extraditability and Order of Commitment for both petitioners. The magistrate found, *inter alia*, that petitioners are the individuals sought by Mexico, that the crimes for which petitioners are sought are extraditable offenses under the Treaty, and that there is probable cause to believe that petitioners committed those crimes in Mexico.

On June 2 and June 21, 1978, Escobedo and Castillo, respectively, filed the instant petitions for writs of *habeas corpus*, seeking to block their extradition. By orders entered December 26, 1978, the Southern District of Florida denied the petitions. This appeal followed. Petitioners urge that the district court erred in not granting the writ because: (1) the evidence offered at the extradition hearing did not establish probable cause to believe that they committed the crimes charged; (2) the offenses charged by Mexico are political in character; (3) petitioners, as United States nationals, are not subject to extradition; and (4) certain humanitarian considerations bar extradition.[3]

## SCOPE OF REVIEW

█ The scope of *habeas corpus* review of a magistrate's extradition order is quite narrow. Such review is limited to determining "whether the magistrate had jurisdiction, whether the offense charged is within the treaty and, by a somewhat liberal extension, whether there was any evidence warranting the finding that there was reasonable ground to believe the accused guilty." *Fernandez v. Phillips*, 268 U.S. 311, 45 S.Ct. 541, 69 L.Ed. 970 (1925); *Gusikoff v. United States*, 620 F.2d 459, 461 (5th Cir. 1980); *Brauch v. Raiche*, 618 F.2d 843, 847 (1st Cir. 1980); *Garcia-Guillern v. United States*, 450 F.2d 1189, 1191 (5th Cir. 1971), *cert. denied*, 405 U.S. 989, 92 S.Ct. 1251, 31 L.Ed.2d 455 (1972). The writ is not a means for rehearing the magistrate's findings. *Fernandez v. Phillips*, 268 U.S. at 312, 45 S.Ct. at 542; *Garcia-Guillern v. United States*, 450 F.2d at 1191–92.

## PROBABLE CAUSE

As stated, petitioners are charged by the Mexican government with murder, attempted murder and attempted kidnapping. These charges arise out of an alleged attempt by petitioners, along with Orestes Ruiz Hernandez [4] to kidnap the Cuban Consul in Merida, Mexico, Daniel Ferrer Fernandez, on July 23, 1976. During the attempt, an associate of the Consul, Artagnan Diaz y Diaz, was shot and killed. Although bullets were allegedly fired at the Consul, he escaped without injury. Escobedo was arrested at the Mexico City airport the day after the incident. He subsequently es-

---

2. 18 U.S.C. § 3184 provides:

 **§ 3184. Fugitives from foreign country to United States**

 Whenever there is a treaty or convention for extradition between the United States and any foreign government, any justice or judge of the United States, or any magistrate authorized so to do by a court of the United States, or any judge of a court of record of general jurisdiction of any State, may, upon complaint made under oath, charging any person found within his jurisdiction, with having committed within the jurisdiction of any such foreign government any of the crimes provided for by such treaty or convention, issue his warrant for the apprehension of the person so charged, that he may be brought before such justice, judge, or magistrate, to the end that the evidence of criminality may be heard and considered. If, on such hearing, he deems the evidence sufficient to sustain the charge under the provisions of the proper treaty or convention, he shall certify the same, together with a copy of all the testimony taken before him, to the Secretary of State, that a warrant may issue upon the requisition of the proper authorities of such foreign government, for the surrender of such person, according to the stipulations of the treaty or convention; and he shall issue his warrant for the commitment of the person so charged to the proper jail, there to remain until such surrender shall be made.

3. Using at times somewhat different arguments, both petitioners, in separate briefs, urge the first three grounds as bars to extradition. Only Escobedo raises the fourth ground. In reviewing each argument raised in support of the first three grounds, we shall not always specify which petitioner is the author of the argument.

4. Hernandez, presently incarcerated in Mexico, is not a party to this proceeding.

caped from a Mexican jail and fled to the United States. Castillo was never apprehended by Mexican authorities.

 In reviewing the existence of probable cause to sustain the charges against petitioners "or, in other words, the existence of a reasonable ground to believe the accused guilty," our function "is to determine whether there is any competent evidence tending to show probable cause. The weight and sufficiency of that evidence is for the determination of the committing court." *Garcia-Guillern v. United States,* 450 F.2d at 1192; *Gusikoff v. United States, supra,* 620 F.2d at 462.[5] In this case, the evidence introduced at the extradition hearing to prove probable cause consisted of various documents submitted by Mexico in support of its extradition request.[6]

 With respect to Escobedo, the documents show that explosives and firearms were found in his luggage at the time of his arrest.[7] A ballistics report contained in the

Extradition Documents concludes that the bullet that killed Diaz y Diaz was fired from one of these firearms.[8] With respect to Castillo, the documents contain a third party's report of a deposition given by the Cuban Consul, Fernandez, to a Mexican official on July 24, 1976.[9] The report states that during the deposition, the Consul was shown a picture of Castillo, and that he "recognized him as one of the persons who performed the attack."[10] At this deposition, and in a statement given to authorities on the day of the attack[11], the Consul is also reported as saying that one of the attackers approached him with a gun, that he thought bullets were fired at him during the incident, and that the attackers attempted to kidnap him. Furthermore, the documents indicate that Castillo's passport was found in Escobedo's luggage at the time of Escobedo's arrest.[12] We hold that this evidence establishes probable cause to believe that both petitioners committed the crimes charged.[13]

**5.** As we said in *Gusikoff:*

Hearings held pursuant to Section 3184 are in the nature of a preliminary hearing. (Citation omitted.) The foreign country does not have to show actual guilt, only probable cause that the fugitive is guilty. (Citations omitted.) The magistrate does not inquire into the guilt or innocence of the accused; he looks only to see if there is evidence sufficient to show reasonable ground to believe the accused guilty. (Citation omitted.) The magistrate also determines whether the offense charged is extraditable and whether the person brought before him is the one accused of crime.

620 F.2d at 462, *quoting from Sayne v. Shipley,* 418 F.2d 679, 685 (5th Cir. 1969), *cert. denied,* 398 U.S. 903, 90 S.Ct. 1688, 26 L.Ed.2d 61 (1970).

**6.** An English translation of these documents was also introduced.

**7.** English Translation of Mexican Extradition Documents [hereinafter referred to as Extradition Documents or Documents] at 35–36; 55–60.

**8.** *Id.* at 71–73.

**9.** *Id.* at 28–30.

**10.** Castillo contends that this report cannot be used to establish probable cause because it constitutes compound hearsay and is untrustworthy. Hearsay, however, is permitted in ex-

tradition proceedings. *See, e. g., Bingham v. Bradley,* 241 U.S. 511, 517, 36 S.Ct. 634, 637, 60 L.Ed. 1136 (1916); *Shapiro v. Ferrandina,* 478 F.2d 894, 902 (2d Cir.), *cert. dismissed,* 414 U.S. 884, 94 S.Ct. 204, 38 L.Ed.2d 133 (1973); *Sayne v. Shipley,* 418 F.2d 679, 685 (5th Cir. 1969), *cert. denied,* 398 U.S. 903, 90 S.Ct. 1688, 26 L.Ed.2d 61 (1970). Further, the credibility of the reported identification is a matter committed to the magistrate and is not reviewable on *habeas corpus. See Garcia-Guillern v. United States,* 450 F.2d at 191–92; *Merino v. United States Marshal,* 326 F.2d 5, 12 (9th Cir. 1963), *cert. denied,* 377 U.S. 997, 84 S.Ct. 1922, 12 L.Ed.2d 1046 (1964).

**11.** Extradition Documents at 9.

**12.** *Id.* at 56.

**13.** The Extradition Documents include confessions made to Mexican authorities by Escobedo and Orestes Ruiz Hernandez. Petitioners contend that these confessions cannot be used for the purpose of establishing probable cause because they were obtained by means of torture. We do not reach this contention because we conclude that the evidence independent of the confessions, discussed above, establishes probable cause. *Cf. Magisano v. Locke,* 545 F.2d 1228, 1230 (9th Cir. 1976) (evidence not obtained from allegedly illegal wiretap sufficient to show probable cause for extradition).

Petitioners contend, however, that the Mexican Extradition Documents should not have been admitted at their extradition hearing; they argue that these documents would have been inadmissible for the purpose of proving probable cause in a Florida court. This argument is without merit. State law does not control the reception of evidence at extradition hearings. *Collins v. Loisel*, 259 U.S. 309, 317, 42 S.Ct. 469, 472, 66 L.Ed. 956 (1922); *Shapiro v. Ferrandina*, 478 F.2d at 901–02; *Sayne v. Shipley*, 418 F.2d at 685. The admissibility of the Mexican Extradition Documents is governed by 18 U.S.C. § 3190, which provides:

### § 3190. Evidence on hearing

Depositions, warrants, or other papers or copies thereof offered in evidence upon the hearing of any extradition case shall be received and admitted as evidence on such hearing *for all the purposes of such hearing if they shall be properly and legally authenticated so as to entitle them to be received for similar purposes by the tribunals of the foreign country from which the accused party shall have escaped, and the certificate of the principal diplomatic or consular officer of the United States resident in such foreign country shall be proof that the same, so offered, are authenticated in the manner required.*

Since the Mexican Extradition Documents were properly certified by the United States Ambassador to Mexico, they were authenticated, and admissible under section 3190. *See, e.g., Shapiro v. Ferrandina*, 478 F.2d at 901–02; *Jimenez v. Aristeguieta*, 311 F.2d 547, 562 (5th Cir. 1962), *cert. denied*, 373 U.S. 914, 83 S.Ct. 1302, 10 L.Ed.2d 415 (1963).

Petitioners next contend that the English translation of the Mexican Extradition Documents contains various inaccuracies and therefore should not be relied upon in assessing probable cause. We reject this argument. After receiving the testimony of an interpreter who appeared on petitioners' behalf, Supp. Record 129–139, the magistrate found that petitioners had failed to impeach the accuracy of the translation. We agree with this finding. In any event, even if petitioners' interpretation of the Documents were accepted, the Documents still support the presence of probable cause.

Finally, petitioners argue that the evidence used to establish probable cause did not satisfy Article VIII of the Extradition Treaty. Article VIII states:

When . . . the fugitives shall have been merely charged with a crime or offense, [an] . . . authenticated and attested copy of the warrant for his arrest in the country where the crime or offense is charged to have been committed, and of the *depositions upon which such warrant may have been issued*, must accompany the requisition as aforesaid.

(Emphasis added). Petitioners contend that Article VIII was breached because none of the documents submitted by Mexico constitute "depositions" in the strictly legal sense, namely:

The testimony of a witness taken upon interrogatories, not in open court, but in pursuance of a commission to take testimony issued by a court, or under a general law on the subject, and reduced to writing and duly authenticated, and intended to be used upon the trial of an action in court.

Black's Law Dictionary (4th ed. 1968). This argument is unpersuasive. The purpose of Article VIII is to provide the asylum country both with proof of the charges brought by the requesting country and with the evidence supporting those charges. The extradition papers forwarded by Mexico fulfill this dual purpose. They include copies of the warrants for petitioners' arrests as well as documents establishing probable cause to believe that the crimes charged were committed.[14] While these documents may not constitute depositions in the strictly legal sense[15], we hold that they do satisfy Article

---

14. Several of these documents are reports of depositions made by others.

15. We note that the term "deposition," in the generic sense, means simply "an affidavit, an oath, a statement under oath." Ballentine Law

VIII. To bar extradition, despite the existence of properly authenticated documents establishing probable cause, because of a narrow and technical definition of the term "deposition" would defeat the intent of the Treaty parties. "It is a familiar rule that the obligations of treaties should be liberally construed so as to give effect to the apparent intention of the parties." *Valentine v. United States ex rel. Neidecker*, 299 U.S. 5, 10, 57 S.Ct. 100, 81 L.Ed. 5 (1936).[16]

## POLITICAL OFFENSE EXCEPTION

Article III of the Extradition Treaty bars extradition, "When the crime or offense charged shall be of a purely political character." Petitioners argue that Mexico's charges, on their face, bring this case within Article III. Mexico charges that petitioners attempted to kidnap the Cuban Consul for the purpose of ransoming him for political prisoners being held in Cuba. These charges trigger the political offense exception because, say petitioners, a political offense includes "a common crime . . committed by an ideologically motivated offender . . . where the common crime is intricately linked to the ideology, motive and intent of the alleged offender."[17] We disagree.

This circuit defines a political offense under extradition treaties as an offense committed in the course of and incidental to a violent political disturbance, such as war, revolution and rebellion. *Garcia-Guillern v. United States*, 450 F.2d at 1192; *Jimenez v. Aristeguieta*, 311 F.2d at 560.[18] An offense is not of a political character simply because it was politically motivated. In this case, petitioners do not contend, and the evidence offered at the extradition hearing does not show, that the charges arising out of the alleged attempted kidnapping were committed in the course of and incidental to a violent political disturbance. Therefore, petitioners are not entitled to haven under Article III of the Treaty.

## NATIONALITY

Article IV of the Extradition Treaty, on its face, invests the Executive Branch of each treaty party with discretion to surrender its own nationals. It states:

Neither of the contracting parties shall be bound to deliver up its own citizens under the stipulations of this convention, but the executive authority of each shall have the power to deliver them up, if, in its discretion, it be deemed proper to do so.

Despite this language, petitioners contend that as United States citizens, they are not subject to extradition to Mexico. Their argument is three-fold.

First, petitioners argue that the discretion given the Executive under Article IV violates due process because no standards

Dictionary, (3d ed. 1969); *accord*, 26A C.J.S. Depositions § 1 at 287 (1956).

**16.** The comments of J. G. Hawley are appropriate:

While in extradition cases the substance of the matter ought to be carefully examined before a man is taken away from the jurisdiction whose protection he is entitled to invoke, there are many reasons why strict technical accuracy is not to be required. The papers are prepared by persons who are educated under foreign codes of law and accustomed to different methods of procedure from those in use in the United States. If a merely technical objection is unnecessarily sustained, it must usually result in a considerable delay if not in a failure of the purposes of extradition altogether. Therefore, in these cases, American magistrates, while for the most part careful not to allow extradition in cases where they were not sufficiently satisfied as to the merits, have been solicitous to prevent a failure of justice by giving effect to merely technical objections.

J. G. Hawley, *Law and Practice of International Extradition*, 41–42 (1893).

**17.** Brief for Petitioner Castillo at 35. Escobedo also argues that the alleged offenses were motivated by ideology rather than ill will toward the victims or a desire for monetary gain. Brief for Petitioner Escobedo at 20–21.

**18.** This definition is derived from the English case of *In Re Castioni*, [1891] 1 Q.B. 149 and is followed by other American courts, *see, e.g., Sindona v. Grant*, 619 F.2d 167 at 173 (2d Cir. 1980); *In re Ezeta*, 62 F. 972, 977–1002 (N.D. Cal.1894). *See generally* I. A. Shearer, *Extradition in International Law* (1971).

are provided to guide the exercise of this discretion. We reject this argument. Contrary to petitioners' suggestion, a United States citizen may not be whisked away to a foreign country for trial by Executive whim. Under 18 U.S.C. § 3186[19], the Secretary of State may not surrender any person to a foreign government unless the person has been found extraditable by a magistrate at a hearing held under 18 U.S.C. § 3184. Executive discretion arises only if the magistrate determines that there is "evidence sufficient to sustain the charge under the provisions of the proper treaty." *Id.* These statutory provisions safeguard the fugitive's due process rights. *See Peroff v. Hylton*, 563 F.2d 1099, 1102–03 (4th Cir. 1977); *Sayne v. Shipley*, 418 F.2d at 686.

Assuming that the magistrate's decision is in favor of extradition, the Executive's discretionary determination to extradite the fugitive[20]—even one who is a United States national—is not generally subject to judicial review.[21] The ultimate decision to extradite is a matter within the exclusive prerogative of the Executive in the exercise of its powers to conduct foreign affairs. *Sindona v. Grant, supra; Peroff v. Hylton*, 563 F.2d at 1102–03; *Shapiro v. Secretary of State*, 499 F.2d 527, 531 (D.C. Cir. 1974), *aff'd. sub nom. Commissioner of Internal Revenue Service v. Shapiro*, 424 U.S. 614, 96 S.Ct. 1062, 47 L.Ed.2d 278 (1976); *Wacker v. Bisson*, 348 F.2d 602, 606 (5th Cir. 1965) ("Review by *habeas corpus* . . . tests only the legality of the extradition proceedings; the question of the wisdom of extradition remains for the Executive Branch to decide."); M.C. Bassiouni, *International Extradition and World Public Order*, 29–34 (1974). This principle was applied in *Peroff v. Hylton, supra*, a case involving the United States-Sweden Extradition Treaty. Article VII of that treaty is substantially identical to Article IV of the treaty with Mexico. The petitioner in *Peroff*, a United States citizen, characterized the Executive's exercise of discretion to extradite nationals under Article VII as an "administrative determination," and claimed that he was entitled, as a matter of due process, to a hearing before the Secretary of State on the propriety of his extradition.[22] Holding that it would be improper for a court to impose such a hearing requirement, the Fourth Circuit stated:

> The need for flexibility in the exercise of Executive discretion is heightened in international extradition proceedings which necessarily implicate the foreign policy interests of the United States. Thus, while Congress has provided that extraditability shall be determined in the first instance by a judge or magistrate, 18 U.S.C. § 3184, the ultimate decision to extradite is 'ordinarily a matter within the exclusive purview of the Executive.'

563 F.2d at 1102. The court concluded that the requirements of procedural due process were satisfied by the hearing provided under 18 U.S.C. § 3184 and by *habeas corpus* review. *Id.* at 1102–03.

---

**19.** Section 3186 provides:

**§ 3186. Secretary of State to surrender fugitive**

The Secretary of State may order the person committed under sections 3184 or 3185 of this title [18 USCS § 3184 or 3185] to be delivered to any authorized agent of such foreign government, to be tried for the offense of which charged.

*Such agent may hold such person in custody, and take him to the territory of such foreign government, pursuant to such treaty.*

A person so accused who escapes may be retaken in the same manner as any person accused of any offense.

**20.** The Secretary of State always has discretion to refuse to extradite, even if the magistrate

under 18 U.S.C. § 3184 concludes that the fugitive is extraditable. *See* 18 U.S.C. § 3186 (the Secretary of State *"may"* extradite the person committed under section 3184); *Sindona v. Grant, supra*, 619 F.2d at 176; *Wacker v. Bisson*, 348 F.2d 602, 606 (5th Cir. 1965); M.M. Whiteman, 6 Digest of International Law 1046 (1968) [hereinafter referred to as Whiteman].

**21.** Petitioners do not contend that the Secretary of State uses constitutionally impermissible criteria in exercising this discretion.

**22.** This hearing would have been in addition to the judicial hearing provided under 18 U.S.C. § 3184.

██ The same sensitivity to the Executive's role in foreign affairs, which prompted the *Peroff* court's refusal to prescribe the procedures by which the Executive exercises its discretion over the extradition of nationals, causes us to reject petitioners' argument that this discretion should be confined within specific standards.

██ Second, contending that a treaty may be modified subsequent to its entry into force by the practice of the parties [23], petitioners claim that ever since the first extradition treaty between the United States and Mexico was concluded in 1861, both governments have consistently refused to surrender their own nationals. Because of this practice, petitioners urge that we hold that Article IV's grant of Executive discretion to deliver up nationals has been repealed. We decline this invitation. Most of the incidents cited by petitioners as evidence of the United States' [24] and Mexico's practice of not surrendering nationals occurred prior to the Supreme Court's 1936 decision in *Valentine v. United States ex rel. Neidecker*, 299 U.S. 5, 57 S.Ct. 100, 81 L.Ed. 5. Yet, in *Valentine*, the court expressly stated that under Article IV, the Secretary of State had discretionary power to surrender United States citizens.[25] *Id.* at 12–17. Indeed, the Court suggested that one of the very reasons the 1899 Treaty was written was to give the Executive this power; the 1861 Treaty which it replaced had been interpreted as not giving the Executive authority to extradite United States citizens. *Id.*

Furthermore, the argument that the treaty parties, through their conduct, have expressed an intention to remove the Executive discretion clause from Article IV is substantially undermined by the terms of the recently executed extradition treaty between the United States and Mexico. 17 *Int'l. Legal Materials* 1068 (1978). Article 9 of the new treaty provides:

1. Neither Contracting Party shall be bound to deliver up its own nationals, but the executive authority of the requested Party shall, if not prevented by the laws of that Party, have the power to deliver them up if, in its discretion, it be deemed proper to do so.

2. If extradition is not granted pursuant to paragraph 1 of this Article, the requested Party shall submit the case to its competent authorities for the purpose of prosecution, provided that Party has jurisdiction over the offense.

While the new treaty does not control this extradition proceeding, see note 1, *supra*, the fact that it invests the Executive with the same discretion as was given under Article IV of the old treaty is evidence that the parties never intended to eliminate this discretion.

██ Finally, petitioners argue that under due process and equal protection principles, they should not be subject to extradition because Mexico does not reciprocate by extraditing its nationals. This argument was rejected by the Supreme Court in

**23.** Without deciding the point, we shall assume *arguendo* that a treaty may be modified by the subsequent practice of the parties. *See, generally*, G. Schwarzenberger, *A Manual of International Law*, 167–68 (5th ed. 1967); 14 Whiteman at 399–406.

**24.** We note in passing that petitioners' assertion that the United States has consistently refused to extradite its nationals under Article IV is factually flawed. The United States has surrendered its nationals under that Article. *See* 6 Whiteman at 866. As stated in a letter from the American Ambassador at Mexico City to a Mexican official:

'Consistent with the long-standing position of the Government of the United States of America . . . the United States has, in

addition to the three United States citizens previously mentioned, granted the extradition of United States citizens [to Mexico] over a period of many years [citing several instances].'

Letter from U.S. Ambassador to Mexico, Hill, to Acting Minister of Foreign Relations of Mexico, Gorostiza (Aug. 22, 1960), *quoted in* 6 Whiteman at 879.

**25.** The specific question in *Valentine* was whether the 1909 Extradition Treaty with France gave the President power to surrender United States citizens. Holding in the negative, the Court contrasted the French treaty, which did not affirmatively grant such power, with Article IV of the Mexican treaty. 299 U.S. at 12–17, 57 S.Ct. at 104–106.

*Charlton v. Kelley*, 229 U.S. 447, 469–76, 33 S.Ct. 945, 952–955, 57 L.Ed. 1274 (1913), and more recently by the Fourth Circuit in *Peroff v. Hylton*, 563 F.2d 1099, 1102 (4th Cir. 1977). We do the same. The question whether the United States should refuse to extradite its citizens because of Mexico's failure to reciprocate[26] is one for the Executive Branch, not the Courts, to decide.[27]

## HUMANITARIAN CONSIDERATIONS

 Alleging that he may be tortured or killed if surrendered to Mexico, Escobedo asks that we bar his extradition on humanitarian grounds. However, "the degree of risk to [Escobedo's] life from extradition is an issue that properly falls within the exclusive purview of the executive branch. *See Peroff v. Hylton*, 542 F.2d 1247, 1249 (4th Cir. 1976), *cert. denied*, 429 U.S. 1062 [97 S.Ct. 787, 50 L.Ed.2d 778] (1977) . . ." *Sindona v. Grant, supra*, 619 F.2d at 174.

The district court's order denying the writ of *habeas corpus* is

AFFIRMED.

---

**26.** The justification often given for the differing practices of the United States and Mexico with respect to extradition of nationals is that the two countries have different concepts of criminal jurisdiction. Mexico, which generally refuses to extradite nationals, has the power, under its laws, to prosecute its citizens for offenses committed abroad. By contrast, the United States, which frequently surrenders its citizens, is generally unable, under its laws, to prosecute its citizens for crimes committed outside its territorial jurisdiction. 6 Whiteman at 876, 878–84. *See also* I.A. Shearer, *Extradition in International Law*, 115 (1971).

**27.** In *Charlton*, the Court stated:
The executive department having thus elected to waive any right to free itself from the obligation to deliver up its own citizens, it is the plain duty of this court to recognize the obligation to surrender the appellant as one imposed by the treaty as the supreme law of the land and as affording authority for the warrant of extradition.
229 U.S. at 476, 33 S.Ct. at 955. Similarly, in *Peroff*, the Court ruled that,
Even if the claimed lack of reciprocity were construed to be a violation of treaty obligations, it would be for the Executive alone to determine whether to waive such violations or to renounce the extradition agreement.
563 F.2d at 1102.