Ramon Aldasoro MAGUNA–
CELAYA, Petitioner,

v.

Robert M. HARO, Chief Warden, Federal Detention Center, Miami, Madeleine K. Albright, United States Secretary of State, and Janet Reno, United States Attorney General, Respondents.

No. 98–1450–CIV.

United States District Court,
S.D. Florida.

Aug. 28, 1998.

*ORDER GRANTING AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND STAYING ISSUANCE OF THE WRIT FOR THIRTY DAYS*

JAMES LAWRENCE KING, District Judge.

THIS CAUSE comes before the Court on Petitioner Ramon Aldasoro Maguna–Celaya's ("Aldasoro") Amended Petition for Writ of Habeas Corpus, filed June 26, 1998. Respondents Robert M. Haro, Madeleine K. Albright, and Janet Reno (collectively "the Government") filed a response on August 10, 1998.

## I. Factual and Procedural Background

At the request of the United States, acting on behalf of the government of Spain, Magistrate Judge Ted E. Bandstra issued a warrant for the arrest of Aldasoro on December 1, 1997. The Spanish government sought Aldasoro's extradition to Spain so that he could stand trial for his alleged involvement in separate incidents of assault, murder, and robbery with intimidation, all in violation of the Spanish Penal Code. Aldasoro was arrested the following day and has since been held in federal custody without bond.

### A. The Charges Against Aldasoro

The United States submitted two requests for Aldasoro's extradition on January 26, 1998: case 31/88, dated December 5, 1997, and case 30/88, dated December 19, 1997. The Government subsequently filed a third request on March 11, 1998 for case 74/88, dated December 5, 1997.

The Government's request in case number 31/88 charges that Aldasoro and three others, Juan Carlos Arruti Azpitarte ("Arruti"), Juan Maria Oyarbide Aramburu ("Oyarbide"), and Manuel Urionabarrenechea Betanzos ("Urionabarrenechea"), are members of an armed faction of the Basque separatist movement known as the ETA.[1] The Government claims that Aldasoro, Arruti, Oyarbide, and Urionabarrenechea are charged with stealing a vehicle and killing two members of the Spanish Civil Guard on April 15, 1988. Aldasoro allegedly drove the get-away car. The group then allegedly fled to the home of

Fletcher Peacock, Assistant Federal Public Defender, Timothy Cone, Assistant Federal Public Defender, Miami, FL, for Plaintiff.

Silvia B. Pinera–Vazquez, Assistant U.S. Attorney, Miami, FL, for Defendant.

1. ETA stands for Euskadi ta Askatasuna, or "The    Basque Country and Liberty."

Inaki Fernandez de Larrino ("Fernandez") and his wife Mirren Pilare Lopez de Lazuriaga ("Lopez") for hiding.[2] The Government states that Arruti, Fernandez, and Lopez were subsequently arrested in Spain and convicted for their involvement in these crimes. Oyarbide and Urionabarrenechea were reportedly killed in an incident with the Spanish Civil Guard on September 16, 1989. Arruti, Fernandez, and Lopez all gave statements at the time of their arrest implicating Aldasoro in the killing of the two Spanish officers. These statements are the only evidence that the Spanish government has provided in support of case number 31/88.

The Government's request in case number 30/88 claims that Aldasoro and three others, including Oyarbide, stole a vehicle at gunpoint on March 27, 1988 and drove to the Parish Church of Santa Maria, where Arruti and two others shot and killed a retired Spanish Air Force General, while Aldasoro waited in the vehicle. The group then allegedly fled to the home of Fernandez and Lopez. The charges against Aldasoro in case number 30/88 also rely solely on the statements given by Arruti, Fernandez, and Lopez at the time of their arrest.

Finally, the Government's request in case number 74/88 claims that in early 1988 Aldasoro, Arruti, and others conspired to attack a Civil Guard barracks. The group allegedly stole a truck at gunpoint, loaded it with explosives and grenades, and placed it near the barracks. They then allegedly triggered the explosives by remote control, and the resulting explosion seriously injured two members of the Civil Guard. To support the charges in this case, the Spanish government has relied on the statements of Arruti and that of another individual named Jose Angel Viguri Camino ("Viguri").

## B. The Evidence Supporting the Charges Against Aldasoro

As noted above, the only evidence supporting the charges in the Government's first and second requests, case numbers 31/88 and 30/88, are the statements made by Arruti, Fernandez, and Lopez. Arruti gave the first of two statements to the Civil Guard on September 20, 1989 implicating Aldasoro in the killing of the two members of the Spanish Civil Guard (the incident had occurred more than a year earlier, on April 15, 1988). The following day, however, Arruti stated that he was forced to make his prior statement and that he refused to affirm or ratify the declaration given to the Civil Guard.[3] Arruti also stated that he was beaten and subjected to electrodes. Arruti's allegations of torture do not appear in the Government's first request for extradition (case number 31/88) but do appear in the second request (case number 30/88). In 1998, Arruti reiterated, in a written statement made under oath, that he had been tortured by the Civil Guard. He also stated that he did not know Aldasoro at the time he was arrested in 1989 and that the accusations that connected Aldasoro with the acts of the ETA were completely false.

The Government's first and second requests also rely on a statement given by Fernandez implicating Aldasoro. Unlike Arruti, Fernandez did ratify his statement the following day. In 1998, however, Fernandez issued a detailed, written statement under oath claiming that when he was first interrogated by the Civil Guard in 1989 he had stated that he did *not* know Aldasoro. After suffering mistreatment at the hands of the Civil Guard, such as being interrogated while naked except for a hood placed over his head, he claims that he told the guards what he needed to in order to inculpate Aldasoro. Fernandez claimed in his 1998 statement that in the resulting trials where he appeared, he stated that his original statements were false and a result of constant threats and psychological torture.

Finally, the Government's first and second requests rely on a September 19, 1989 statement given by Lopez to the Civil Guard, in which she also implicated Aldasoro. Lopez ratified that statement the following day. In

---

2. Although the parties use slightly different names for the individuals allegedly involved in these incidents, the Court will refer to them as identified in the Magistrate's Order Certifying Extradition.

3. Spanish legal procedure requires those who have given statements to the authorities to either ratify or disavow those statements in court.

1998, however, Lopez issued a detailed, written statement under oath in which she claimed that she was beaten and threatened by members of the Civil Guard. Lopez explained that in one of the interrogation sessions, the guards arranged it so that she could listen to her husband's screams while guards hung him out a window by his feet and threatened to drop him. Lopez claims that her husband later confirmed that this was in fact done to him.

The Government's third request for extradition (case number 74/88) is supported by a second statement given by Arruti on September 21, 1989 and by a statement given by Viguri. As noted above, Arruti refused to ratify his statements to the Civil Guard and alleged that he had been tortured. These allegations of torture, absent from the Government's first request but present in the second request, also fail to appear in the Government's third request for extradition. Viguri gave his statement implicating Aldasoro to the Civil Guard on September 19, 1989. The following day, Viguri ratified his statement and verified as true a "certified confession" purportedly given by Aldasoro. Significantly, however, there is no evidence that Aldasoro was ever arrested or that he ever gave a confession. In 1998, Viguri also issued a handwritten statement (although unsworn) claiming that his statements implicating Aldasoro were induced by mistreatment, especially psychological, and beatings, and that at the time he gave his original statements he did not know anyone by Aldasoro's name.

## C.  The Extradition Hearing

Magistrate Judge Bandstra held an extradition hearing on May 28, 1998 in accordance with the federal statutory scheme that governs extradition proceedings. *See* 18 U.S.C.A. § 3184 (West Supp.1998). At the hearing, Aldasoro argued against extradition on two grounds: (1) that his alleged crimes were non-extraditable political offenses under the 1970 Extradition Treaty between the United States and Spain, and (2) that the

statements supporting the Government's requests for extradition should be excluded because they were false and the product of torture.[4]

To rebut Aldasoro's claims of torture, the Government submitted at the hearing a declaration by the chief prosecutor of a Spanish national court located in Madrid. The chief prosecutor stated that there never was a formal complaint of mistreatment against the members of the Civil Guard who took statements from the individuals who implicated Aldasoro. In response, Aldasoro argued that the chief prosecutor's statement was misleading, because included in Spain's own extradition documents was the September 1989 statement by Arruti claiming that he had been tortured.

Subsequent to the hearing, Aldasoro has secured sworn statements from Jose Maria Matanzas ("Matanzas"), who served as Arruti's attorney in 1989. (*See* Am. Pet. for Writ of Habeas Corpus, Ex. B.) Matanzas corroborates Arruti's assertions by stating that in 1989 he saw signs of torture on Arruti and that the three other declarants, Fernandez, Lopez, and Viguri, all complained during their trials, both to Matanzas and to the court, that they were tortured following arrest.[5] Thus, Matanzas's testimony also undercuts the Spanish chief prosecutor's statement, which seems to imply that there never were any complaints of mistreatment against the Spanish Civil Guard.

In an Order filed June 17, 1998, Magistrate Judge Bandstra concluded that it was proper to certify Aldasoro's extradition to the Secretary of State. First, the Magistrate found that the 1988 Second Supplemental Treaty (amending the original 1970 Treaty between the United States and Spain) was applicable to this case and, as a result, Aldasoro could not argue that the crimes with which he was charged constituted non-extraditable political offenses under the 1970 Treaty. Second, the Magistrate found that the Government had established probable cause to believe that

---

4. The Court notes that Petitioner filed his Motion in Limine to exclude the statements only two days before the extradition hearing.

5. Matanzas also stated that he was responsible for obtaining the four declarants' 1998 statements claiming that they were tortured.

Aldasoro committed the charged offenses. In so finding, the Magistrate denied Aldasoro's motion in limine to have the 1989 statements of Arruti, Fernandez, and Lopez excluded (Petitioner did not submit Viguri's statement until after the extradition hearing).

Concerning the allegations of torture, the Magistrate reasoned that an individual's evidence contradicting the Government's evidence that he committed the crimes charged is ordinarily inadmissible in an extradition proceeding. Therefore, "the recantations of all three witnesses, including Arruti, present conflicting evidence not resolvable in this proceeding." (Order Certifying Extradition at 9.) Moreover, the Magistrate found it significant that the allegations of torture were uncorroborated and the statements were not sworn to before any public official in Spain.

> In short, the Court finds no basis to accept into evidence or give considerable weight to the recantations of the three declarants relied upon by Aldasoro in opposing extradition here. While not minimizing the seriousness of the matters declared herein, the Court finds that these matters are necessarily resolved only in the Requesting State.

(*Id.* at 10.)

On June 26, 1998, Aldasoro filed an Amended Petition for Writ of Habeas Corpus with this Court, seeking relief from the Magistrate's Order certifying his extradition. As a result, Magistrate Bandstra issued an Order on July 2, 1998 staying his Order Certifying Extradition pending the resolution of the instant petition for writ of habeas corpus.

## II. Analysis

The Government's requests for extradition in this case are founded on the extradition treaty that has been in effect between the United States and Spain since 1970. Treaty on Extradition, May 29, 1970, U.S.-Spain, 22 U.S.T. 737 [hereinafter "Extradition Treaty"]. The parties amended that treaty in 1988 with the Second Supplementary Treaty, which took effect in 1993 and, among other

things, narrowed the category of political offenses for which extradition is unavailable.

The Government's requests triggered the statutory provisions that govern the extradition process. First, a judicial officer,[6] after receiving a complaint, issues an arrest warrant for the individual whose extradition is sought (known as the "relator"), provided that there exists an extradition treaty between the United States and the country requesting extradition and that the crime charged is covered by the treaty. *See* 18 U.S.C.A. § 3184 (West Supp.1998). The judicial officer then conducts a hearing "to the end that the evidence of criminality may be heard and considered." *Id.* "If, on such hearing, he deems the evidence sufficient to sustain the charge under the provisions of the proper treaty or convention," the officer must certify to the Secretary of State that extradition is proper and transmit a copy of the testimony and evidence submitted at the hearing. *Id.* The Secretary of State then has the discretion to determine whether or not the relator should actually be extradited. *See id.* § 3186. The discretion afforded to the Secretary of State allows her to take into account human rights and foreign policy considerations, or to attach conditions to the surrender of the individual. *See generally* M. Cherif Bassiouni, *International Extradition: United States Law and Practice* 766–73 (3d ed.1996). The First Circuit has recently highlighted the wisdom of this dual scheme:

> This bifurcated procedure reflects the fact that extradition proceedings contain legal issues peculiarly suited for judicial resolution, such as questions of the standard of proof, competence of evidence, and treaty construction, yet simultaneously implicate questions of foreign policy, which are better answered by the executive branch. Both institutional competence rationales and our constitutional structure, which places primary responsibility for foreign affairs in the executive branch, support this division of labor.

*United States v. Kin–Hong,* 110 F.3d 103, 110 (1st Cir.1997) (citation omitted).

---

**6.** The judicial officer may be a federal judge, an authorized magistrate, or a state judge of a court of general jurisdiction. *See* 18 U.S.C.A. § 3184 (West Supp.1998).

■ Once a magistrate judge has certified an individual's extraditability, as in this case, the individual may only attack that certification through a petition for a writ of habeas corpus. *See Fernandez v. Phillips,* 268 U.S. 311, 312, 45 S.Ct. 541, 69 L.Ed. 970 (1925); *Yapp v. Reno,* 26 F.3d 1562, 1565 (11th Cir. 1994); *Castro Bobadilla v. Reno,* 826 F.Supp. 1428, 1431 (S.D.Fla.1993) ("As there are no appeal rights under 18 U.S.C. § 3184, a habeas corpus petition may be used to contest a Magistrate's decision on foreign extradition.") (citation omitted), *aff'd,* 28 F.3d 116 (11th Cir.1994). This Court possesses jurisdiction over Aldasoro's petition for a writ of habeas corpus. *See* 28 U.S.C. § 2241(a).

■ On a habeas corpus challenge to a certification of extraditability, a district court's scope of review is quite limited. The Court may only inquire into three areas: (1) whether the magistrate judge had jurisdiction to certify extradition; (2) whether the offense charged fell within the applicable treaty; and (3) "whether there was any evidence warranting the finding that there was reasonable ground to believe the accused guilty." *Yapp,* 26 F.3d at 1565 (citations omitted). While the Court emphasizes that its role in the extradition process is unquestionably limited, the Court is also keenly aware of "the ultimate safeguard that extradition proceedings before United States courts comport with the Due Process Clause of the Constitution." *Kin–Hong,* 110 F.3d at 106.

In order to protect against any violation of due process, the Court must, in accordance with the third prong listed above, determine if probable cause supports the charges against the relator. At the outset, the Court notes that federal law regarding probable cause controls this case. The Extradition Treaty between the United States and Spain specifically provides that "[t]he determination that extradition based upon the request therefor should or should not be granted shall be made in accordance with this Treaty and *with the law of the requested Party.*" Extradition Treaty, art. IX (emphasis added). *See generally In re Extradition of Schweidenback,* 3 F.Supp.2d 113 (D.Mass.

1998) (discussing whether federal or state standard of probable cause should apply).

■ It is well-established that evidence supporting probable cause need not be evidence that would ultimately lead to a conviction at trial. *See, e.g., Kin–Hong,* 110 F.3d at 120 (noting that "preliminary hearing is not a minitrial of the issue of guilt") (citation omitted); *Castro Bobadilla,* 826 F.Supp. at 1432. "Courts have long understood that the hearing before the extradition magistrate does not determine the guilt or innocence of the accused but rather represents a judgment whether there is competent evidence that would support a reasonable belief that the subject of the proceedings was guilty of the crimes charged." *Gill v. Imundi,* 747 F.Supp. 1028, 1038 (S.D.N.Y.1990) (citations omitted). Thus, the Court must look for "the existence of a reasonable ground to believe the accused guilty." *Escobedo v. United States,* 623 F.2d 1098, 1102 (5th Cir.) (citations omitted), *cert. denied,* 449 U.S. 1036, 101 S.Ct. 612, 66 L.Ed.2d 497 (1980). Probable cause has also been described as "the level of evidence 'sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the accused's guilt.'" *In re Extradition of Contreras,* 800 F.Supp. 1462, 1464 (S.D.Tex. 1992) (quoting *In re Extradition of Atta,* 706 F.Supp. 1032, 1050 (E.D.N.Y.1989)). In short, the Court must ensure that competent evidence, rather than uncorroborated suspicion, supports the request for extradition. As a leading commentator has explained:

> Whatever else may be implied, probable cause means that sufficient evidence has been presented to the satisfaction of the court to warrant bringing the relator to trial in accordance with the laws of the requesting state, not simply that he is suspected of criminality with no basis in fact to support it. If indeed no evidence of probable cause exists, then the assertions presented by the requesting state constitute nothing more than mere suspicion and the request must be denied.

Bassiouni, *supra,* at 713.

In the present case, the Court agrees with the Magistrate's conclusion that the statements of four individuals implicating Aldaso-

ro would normally be sufficient to establish probable cause. *See Contreras,* 800 F.Supp. at 1465 (noting that evidence consisting of eleven sworn statements would appear, "facially," to satisfy probable cause). Aldasoro does not appear to contest this proposition either, arguing instead that the statements of the four declarants are unreliable because they were obtained through torture and later recanted. The Magistrate concluded, however, that the evidence of torture contradicted the Government's evidence and was therefore likely inadmissible. He therefore refused to give it considerable weight.

In reaching this conclusion, the Magistrate relied on an evidentiary distinction that has been established in extradition cases. Courts have held that while an individual charged with extradition may present evidence explaining the charges against him, he may not present evidence contradicting them. *See, e.g., Shapiro v. Ferrandina,* 478 F.2d 894, 905 (2d Cir.), *cert. dismissed,* 414 U.S. 884, 94 S.Ct. 204, 38 L.Ed.2d 133 (1973). This "somewhat murky principle," *Gill,* 747 F.Supp. at 1040, has often been cited by courts without explanation as to what constitutes evidence that explains and what constitutes evidence that contradicts. The court in *Gill,* however, noted that the "distinction, acknowledgably 'difficult to articulate,' becomes less wooden when its purpose of preventing a full-scale trial, involving witnesses telling competing stories, is contemplated." *Id.* at 1044 (internal citation omitted). Therefore, courts refuse to allow defensive evidence, such as evidence of alibi or insanity, in order to prevent the extradition hearing from becoming a full-blown minitrial on the merits. *See Contreras,* 800 F.Supp. at 1464.

The Magistrate aptly noted this evidentiary restraint on the relator. The Magistrate failed, however, to go further and examine an equally well-established exception to the relator's inability to present evidence contrary to the Government's proof. When an individual seeks to present evidence that negates *all* bases for probable cause, such evidence must be admitted, because if

the individual can successfully show the court that all bases for charging him are unreliable, then there is no evidence to support his extradition. "Thus, it has been held appropriate to permit evidence that tends to obliterate probable cause . . . ." *In re Extradition of Mainero,* 990 F.Supp. 1208, 1218–19 (S.D.Cal.1997) (citing cases); *see Shapiro v. Ferrandina,* 355 F.Supp. 563, 572 (S.D.N.Y. 1973) ("While the process of definition is difficult in the area of 'probable cause' perhaps it is enough to say that what tends to obliterate probable cause may be considered but not what merely contradicts it."); Bassiouni, *supra,* at 731 ("[T]he requirement that explanatory evidence tending to rebut or obliterate probable cause be admissible remains valid.").

A relator may certainly "obliterate" probable cause by showing that all the evidence presented against him was secured through coercion or torture. *Cf. Kin–Hong,* 110 F.3d at 121 (noting unreliability of confession obtained by duress). The court in *In re Extradition of Contreras* faced precisely this issue. 800 F.Supp. at 1463. In that case, Mexico sought the extradition of Contreras for the alleged amassing of arms and smuggling of firearms. The Mexican government had obtained written confessions from eleven individuals identifying Contreras as the source of the weapons. All of the declarants, however, subsequently recanted their confessions and claimed that they were obtained under duress. Noting the circumstances surrounding the original statements, and that the recantations were made at the first opportunity given (the following day), the court concluded that the recantations were reliable. The court explained that "where a prior statement is shown to be coerced and the indicia of reliability is on the recantation, then the subsequent statement negating the existence of probable cause is germane." *Id.* at 1469. The court concluded that the evidence supporting the charges against Contreras was unreliable, and in the absence of any other evidence implicating him, the government had failed to establish probable cause.[7]

---

7. The Court notes that refusing to rely on evidence secured through torture comports with

■ The situation in the present case is similar. The *only* evidence linking Aldasoro to the crimes charged consists of the statements of four declarants: Arruti, Fernandez, Lopez, and Viguri. Arruti recanted his statement to the Spanish Civil Guard at the first opportunity given to him: the day following his first statement and the same day as his second statement. As in *Contreras,* the rapidity with which the recantation was made lends it heightened credibility. *Id.* at 1468. Also on the day following his original statement, Arruti claimed that he had been beaten and subjected to electrodes. While the other three declarants failed to disavow their original statements on the day after they were made, all four declarants have recently issued written statements (all sworn except for Viguri's) recanting their original statements to the Spanish Civil Guard. All have stated that they were tortured or mistreated in some way and were coerced into implicating Aldasoro, a person they now claim they did not even know at the time the crimes were committed.

Moreover, the Court finds it significant that Viguri's original statement to the Civil Guard verified as true a purported "certified confession" given by Aldasoro. The record does not reveal, however, the existence of any such confession. Indeed, it is unlikely that one exists in light of the fact that Aldasoro was never arrested in relation to these incidents. The probability of a fabrication in Viguri's original statement lends support to the conclusion that the declarants' recantations are more reliable than their original statements linking Aldasoro to the crimes charged. Thus, contrary to the Magistrate's finding, there does exist independent, corroborating evidence that the original statements of the four declarants are not worthy of credence. Furthermore, Aldasoro has presented a statement by Matanzas, who served as Arruti's lawyer in 1989, in which Matanzas states that he witnessed signs of torture on Arruti after he was interrogated. This statement provides further independent proof that the declarants' original statements are unreliable. Finally, the only evidence supplied by the Government to rebut the allegations of torture is misleading. The declaration by the Spanish chief prosecutor, claiming that there was never any complaint of mistreatment by the Civil Guard, is contradicted by Spain's own extradition documents, which contain the September 1989 statement by Arruti claiming that he had been tortured.

The Court recognizes the existence of factors that raise suspicions concerning the recantations. As the Government has pointed out, the recantations were written almost nine years after the initial arrests. Moreover, the recantations were executed by four individuals whose sworn statements, if untrue, would subject them only to perjury prosecutions in the United States (which seem highly unlikely given their incarceration in Spain), rather than to any penalty for perjury in Spain. The Court finds, however, that the evidence favors reliability of the recantations over that of the original statements.

■ More importantly, the Government has failed to come forward with *any* other evidence supporting probable cause. When all the evidence presented by the Government in an extradition proceeding is credibly tainted, thereby obliterating probable cause, the Court agrees with Petitioner that the burden should shift to the Government to come forward with independent evidence that the relator committed the crimes charged. Such a rule would protect the Court's preeminent duty to guard against due process violations and ensure that a relator is extradited only after an adequate showing of probable cause. *See Escobedo,* 623 F.2d at 1102 n. 2

fundamental international norms proscribing the use of torture. These norms have been codified in the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, opened for signature Feb. 4, 1985, G.A. Res. 39/46, 39 U.N. GAOR Supp. No. 51 at 197, U.N. Doc. A/RES/39/708 (1984), *reprinted in* 23 I.L.M. 1027 (1984). The United States ratified the Convention on October 21, 1994. *See Recent Actions to Which the United States Is a Party,* 34 I.L.M. 590, 591 (1995). Moreover, "[t]here can be little doubt that customary international law recognizes a prohibition on torture." John Dugard & Christine Van Den Wyngaert, *Reconciling Extradition with Human Rights,* 92 Am. J. Int'l L. 187, 197 (1998). Article 15 of the Convention specifically states that "any statement which is established to have been made as a result of torture shall not be invoked as evidence in any proceedings."

(relying on evidence independent of confessions obtained through torture in finding probable cause); *Gill,* 747 F.Supp. at 1046 (remanding to extradition judge so that government could produce independent evidence not tainted by torture).

The Court therefore concludes that the evidence of torture and coerced statements should have been fully considered by the Magistrate in this case. Such evidence, which appears to be reliable and more worthy of credence than the original statements relied on by the Government, completely negates the existence of probable cause. Without the original statements by Arruti, Fernandez, Lopez, and Viguri, the Court fails to find the "existence of a reasonable ground to believe the accused guilty." *Escobedo,* 623 F.2d at 1102.

Because the Court concludes that the Government has failed to establish probable cause, the Court will forego an analysis of Aldasoro's second contention: that applying the 1988 Second Supplementary Treaty to this case is based on an improper interpretation of that document's retroactivity provision, in violation of the void-for-vagueness doctrine and the ex post facto clause of the U.S. Constitution. Where possible, the Court must avoid unsettled Constitutional questions. *See Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83, ——, 118 S.Ct. 1003, 1021, 140 L.Ed.2d 210 (1998) (Stevens, J., concurring) ("[I]t is always prudent to avoid passing unnecessarily on an undecided constitutional question.").

### III. Conclusion

For the reasons set forth above, Aldasoro's petition for a writ of habeas corpus shall be granted. However, the Court will stay issuance of the writ for thirty (30) days to allow the Government an opportunity to renew its request for extradition and present any further, untainted evidence supporting the charges against Aldasoro. *See Shapiro,* 478 F.2d at 914 (discharging petitioner unless authorized judge "certifies within thirty days his extraditability in accordance with this opinion").

Accordingly, after a careful review of the record and the Court being otherwise fully advised, it is

ORDERED and ADJUDGED that Petitioner's Amended Petition for Writ of Habeas Corpus be, and the same is hereby, GRANTED. It is further

ORDERED and ADJUDGED that the issuance of the writ be, and the same is hereby, STAYED for a period of thirty (30) days from the date of this Order.