REVISED - August 23, 1999

**UNITED STATES COURT OF APPEALS
FIFTH CIRCUIT**

_____

No. 98-41597

_____

ELIZAPHAN NTAKIRUTIMANA,

                    Petitioner-Appellant,

versus

JANET RENO, Attorney General of the United
States; MADELEINE ALBRIGHT, Secretary of State
of the United States; JUAN GARZA, Sheriff of
Webb County, Texas,

                    Respondents-Appellees.

Appeal from the United States District Court
for the Southern District of Texas

August 5, 1999

Before EMILIO M. GARZA, DeMOSS, and PARKER, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

Elizaphan Ntakirutimana appeals the district court's denial of his habeas corpus petition that challenged the district court's grant of a second request for surrender. He alleges that the district court erred because (1) the Constitution of the United States requires an Article II treaty for the surrender of a person to the International Criminal Tribunal for Rwanda ("ICTR" or "Tribunal"),[1] (2) the request for surrender does not establish probable cause, (3) the United Nations ("U.N.")

---

[1] The full name of the Tribunal is: International Tribunal for the Prosecution of Persons Responsible for Genocide and Other Serious Violations of International Humanitarian Law Committed in the Territory of Rwanda and Rwandan Citizens Responsible for Genocide and Other Such Violations Committed in the Territory of Neighboring States. *See* National Defense Authorization Act, Pub. L. 104-106, § 1342(c)(2), 110 Stat. 486 (1996).

Charter does not authorize the Security Council to establish the ICTR, and (4) the ICTR is not capable of protecting fundamental rights guaranteed by the United States Constitution and international law. We affirm.

I

Rwanda has been the source of ongoing ethnic conflict between members of the majority Hutu and minority Tutsi tribes. In April 1994, President Juvenal Habyarimana of Rwanda, a Hutu, was killed when his aircraft crashed due to an artillery attack. The crash triggered a wave of violence by the Hutus against the Tutsis, which resulted in the deaths of between 500,000 and one-million persons. Tutsi rebels triumphed over the Hutus, and the Tutsi-dominated government then requested the U.N. to create an international war crimes tribunal. An investigation by the U.N. established that the mass exterminations of the Tutsis—motivated by ethnic hatred—had been planned for months. The Security Council adopted Resolution 955, which created the ICTR to prosecute and to punish the individuals responsible for the violations in Rwanda and its neighboring states between January 1 and December 31, 1994. The Resolution directed that "all States shall take any measures necessary under their domestic law to implement the provisions of the present resolution and the Statute [of the ICTR]."[2] S.C. Res. 955, U.N. SCOR, 49th Sess., 3453d mtg. at 1-2 (1994), *reprinted in* 33 I.L.M. 1598, 1601 (1994).

In 1995, the President of the United States entered into an executive agreement with the ICTR, entitled the Agreement on Surrender of Persons Between the Government of the United States and the International Tribunal for the Prosecution of Persons Responsible for Genocide and Other Serious Violations of International Humanitarian Law Committed in the Territory of Rwanda and Rwandan Citizens Responsible for Genocide and Other Such Violations Committed in the Territory of Neighboring States ("Agreement"). The Agreement provided that the United States "agrees to surrender to the Tribunal . . . persons . . . found in its territory whom the Tribunal has charged with

_____

[2] The Statute of the ICTR, which is annexed to Resolution 955, and the Rules of Procedure and Evidence of the ICTR guide proceedings before the ICTR.

or found guilty of a violation or violations within the competence of the Tribunal." Agreement, art. 1, cl. 1, Jan. 24, 1995, U.S.-Int'l Trib. Rwanda, 1996 WL 165484, at *1 (Treaty). In 1996, Congress enacted Public Law 104-106 to implement the Agreement. *See* National Defense Authorization Act, Pub. L. 104-106, § 1342, 110 Stat. 486 (1996). Section 1342(a)(1) of this legislation provides that the federal extradition statutes (18 U.S.C. §§ 3181 *et seq.*) shall apply to the surrender of persons to the ICTR. Among the statutory provisions made applicable is 18 U.S.C. § 3184. This section authorizes a judicial officer to hold a hearing to consider a request for surrender. If the judicial officer finds the evidence sufficient to sustain the charges under the treaty or convention, then the officer certifies to the Secretary of State that the individual may be surrendered. *See also* 18 U.S.C. § 3186 (conferring final authority on the Secretary of State to order a fugitive's surrender where a judicial officer has ruled that the requirements for extradition have been met).

In June and September 1996, the ICTR returned two indictments against Pastor Ntakirutimana, charging him with the crimes of genocide, complicity in genocide, conspiracy to commit genocide, crimes against humanity, and serious violations of Article 3 common to the Geneva Conventions and of Additional Protocol II thereto.[3] At the time of the charges, Ntakirutimana, a Hutu, served as President of the Seventh Day Adventist Church for all of Rwanda. He was based in a church complex (the "Complex") in Mugonero, Gishyita Commune, Kibuye Prefecture, Rwanda,[4] and was well known in the Complex and the community. The first indictment alleges that, following the beginning of the wave of violence in 1994, Ntakirutimana and other individuals prepared and executed a plan by which they encouraged large numbers of the local Tutsi population to seek refuge in the Complex. They separated the Hutus from the Tutsis and encouraged the Hutus to leave. Ntakirutimana then raised an armed mob of Hutus, led them to the Complex, and directed the

---

[3] Article 2 of the Statute of the ICTR provides that the ICTR has the power to prosecute genocide, including complicity in genocide and conspiracy to commit genocide. Article 3 provides the ICTR with the power to prosecute crimes against humanity. Article 4 provides the ICTR with the power to prosecute serious violations of Article 3 common to the Geneva Conventions and of Additional Protocol II thereto. *See* S.C. Res. 955, at 3-5.

[4] A "prefecture" is like a state, and a "commune" is like a county within a state.

-3-

slaughter of the Tutsis who had sought shelter there. A Tribunal Judge confirmed the indictment and issued a warrant for Ntakirutimana's arrest.

The second indictment charges Ntakirutimana with conduct that occurred after the massacre at the Complex. The survivors of the attack fled to the Bisesero area of Kibuye Prefecture, Rwanda. The indictment alleges that Ntakirutimana drove armed Hutu soldiers into the Bisesero region, hunted for hiding Tutsis, and ordered the soldiers to kill them. A Tribunal Judge confirmed the second indictment and issued another warrant for Ntakirutimana's arrest.

Ntakirutimana has legally resided in Laredo, Texas since he left Rwanda in 1994. The ICTR requested that the United States extradite Ntakirutimana to the ICTR pursuant to the Agreement. In September 1996, the Government filed a request for Ntakirutimana's surrender to the ICTR in the Southern District of Texas. A Magistrate Judge, serving as the judicial officer, denied the Government's request for surrender. He held that Public Law 104-106 is unconstitutional because, based on historical practice, extradition requires a treaty. *See In re Surrender of Ntakirutimana,* 988 F. Supp. 1038, 1042 (S.D. Tex. 1997). He held alternatively that the request for surrender, and the supporting documents, did not provide probable cause to support the charges. *See id.* at 1044.

To address the evidentiary issues raised by the Magistrate Judge, the Government added two declarations, and filed another request for surrender in the same court.[5] The district court certified the surrender to the ICTR.[6] The court held that the Agreement and Public Law 104-106 provide a constitutional basis for the extradition of Ntakirutimana. Among other reasons, the court found that the Constitution sets forth no specific requirements for extradition, that the Supreme Court has indicated its approval of extraditions made in the absence of a treaty, and that there is precedent

---

[5] The government did not appeal the request, because extradition decisions are not appealable under 28 U.S.C. § 1291. *See In re Extradition of Howard,* 996 F.2d 1320, 1325 (1ˢᵗ Cir. 1993) (explaining that the extradition judge is not acting in his capacity as an Article III judge, and thus the decision is not a decision of the "district court"). The government's remedy is to file another request. *See, e.g., id.* at 1325; *Gusikoff v. United States,* 620 F.2d 459, 461 (5ᵗʰ Cir. 1980).

[6] The district court judge served as the judicial officer for the extradition proceeding. We recognize that the order issued by the judge is not an order of the "district court," yet we refer to it as such for simplicity.

wherein fugitives were extradited pursuant to statutes that "filled the gap" left by a treaty provision. *See In re Surrender of Ntakirutimana,* No. CIV. A. L-98-43, 1998 WL 655708, at * 9, 17 (S.D. Tex. Aug. 6 1998). The court also held that the evidence sufficed to establish probable cause for the charges against Ntakirutimana. *See id.* at *30. Ntakirutimana filed a petition for a writ of habeas corpus under 28 U.S.C. § 2241. The district court denied the petition, and Ntakirutimana has timely appealed.[7]

## II

The scope of habeas corpus review of the findings of a judicial officer that conducted an extradition hearing is extremely limited. *See Garcia-Guillern v. United States,* 450 F.2d 1189, 1191 (5th Cir. 1971). We inquire only into (1) whether the committing court[8] had jurisdiction, (2) whether the offense charged is within the treaty, and (3) whether the evidence shows a reasonable ground to believe the accused guilty. *See Fernadez v. Phillips,* 268 U.S. 311, 312, 45 S. Ct. 541, 542, 69 L. Ed. 970 (1925); *Garcia-Guillern,* 450 F.2d at 1191. A writ of habeas corpus in a case of extradition is not a means for rehearing the findings of the committing court. *See Fernandez,* 268 U.S. at 312, 45 S. Ct. at 542; *Oteiza v. Jacobus,* 136 U.S. 330, 334, 10 S. Ct. 1031, 1032, 34 L. Ed. 464 (1890); *Escobedo v. United States,* 623 F.2d 1098, 1101 (5th Cir. 1980).

## III

Ntakirutimana alleges that Article II of the Constitution of the United States requires that an extradition occur pursuant to a treaty. It is unconstitutional, he claims, to extradite him to the ICTR pursuant to a statute in the absence of a treaty. Accordingly, he claims it is unconstitutional to extradite him on the basis of the Agreement and Pub. Law 104-106 (the "Congressional-Executive

---

[7] We granted a stay of extradition pending appeal.

[8] The judicial officer, whether state or federal, who is authorized to hold an extradition hearing pursuant to the terms of 18 U.S.C. § 3184 is often referred to as a "magistrate" or as the "committing court." *See Sayne v. Shipley,* 418 F.2d 679, 685 n.15 (5th Cir. 1969).

Agreement").[9] The district court concluded that it is constitutional to surrender Ntakirutimana in the absence of an "extradition treaty," because a statute authorized extradition. We review this legal issue *de novo*.[10] *See United States v. Luna,* 165 F.3d 316, 319 (5th Cir. 1999), *cert. denied, __ U.S. __,* 119 S. Ct. 1783, 143 L. Ed. 2d 811 (1999) (reviewing constitutionality of extradition statute *de novo*).

To determine whether a treaty is required to extradite Ntakirutimana, we turn to the text of the Constitution. Ntakirutimana contends that Article II, Section 2, Clause 2 of the Constitution requires a treaty to extradite. This Clause, which enumerates the President's foreign relations power, provides in part that "[the President] shall have Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur; and he shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls . . . ." U. S. CONST. art. II, § 2, cl. 2. This provision does not refer either to extradition or to the necessity of a treaty to extradite. The Supreme Court has explained, however, that "[t]he power to surrender is clearly included within the treaty-making power and the corresponding power of appointing and receiving ambassadors and other public ministers." *Terlinden v. Ames,* 184 U.S. 270, 289, 22 S. Ct. 484, 492, 46 L. Ed. 534 (1902) (citation omitted).

Yet, the Court has found that the Executive's power to surrender fugitives is not unlimited. In *Valentine v. United States,* 299 U.S. 5, 57 S. Ct. 100, 81 L. Ed. 5 (1936), the Supreme Court considered whether an exception clause[11] in the United States's extradition treaty with France

---

[9] *See* THE RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW, § 303 cmt. e (1986) (describing Congressional-Executive agreements).

[10] We may review this issue because Ntakirutimana's challenge to the constitutionality of the statute, pursuant to which the district court issued the certification of extraditability, represents a challenge to the committing court's jurisdiction. *See, e.g., Manrique Carreno v. Johnson,* 899 F. Supp. 624, 629 (S.D. Fla. 1995) (construing constitutionality argument as a challenge to the committing court's jurisdiction).

[11] The exception clause provided, "Neither of the contracting Parties shall be bound to deliver up its own citizens or subjects under the stipulations of this convention." *Valentine,* 299 U.S. at 7, 57 S. Ct. at 102 (citations omitted). Historically, "[w]here treaties have provided for the extradition of persons without exception, the United States has always construed its obligation as embracing its

implicitly granted to the Executive the discretionary power to surrender citizens. The Court first stated that the power to provide for extradition is a national power that "is not confided to the Executive in the absence of treaty or legislative provision." *Id.* at 8, 57 S. Ct. at 102. The Court explained:

> [The power to extradite] rests upon the fundamental consideration that the Constitution creates no executive prerogative to dispose of the liberty of the individual. Proceedings against him must be authorized by law. There is no executive discretion to surrender him to a foreign government, unless that discretion is granted by law. It necessarily follows that as the legal authority does not exist save as it is given by act of Congress or by the terms of a treaty, it is not enough that the statute or treaty does not deny the power to surrender. It must be found that statute or treaty confers the power.

*Id.* at 9, 57 S. Ct. at 102.

The Court then considered whether any statute authorized the Executive's discretion to extradite. The Court commented that:

> Whatever may be the power of the Congress to provide for extradition independent of treaty, that power has not been exercised save in relation to a foreign country or territory "occupied by or under the control of the United States." Aside from that limited provision, the Act of Congress relating to extradition simply defines the procedure to carry out an existing extradition treaty or convention.

*Id.* at 9, 57 S. Ct. at 102-03 (citations omitted). The Court concluded that no statutory basis conferred the power on the Executive to surrender a citizen to the foreign government. *See id.* at 10, 57 S. Ct. at 103. The Court subsequently addressed whether the treaty conferred the power to surrender, and found that it did not. *See id.* at 18, 57 S. Ct. at 106. The Court concluded that, "we are constrained to hold that [the President's] power, in the absence of statute conferring an independent power, must be found in the terms of the treaty and that, as the treaty with France fails to grant the necessary authority, the President is without the power to surrender the respondents." *Id.* The Court added that the remedy for this lack of power "lies with the Congress, or with the treaty-making power wherever the parties are willing to provide for the surrender of citizens." *Id.*

---

citizens." *Id.* (citation omitted). Exception clauses excuse a government from surrendering its own citizens.

*Valentine* indicates that a court should look to whether a treaty *or statute* grants executive discretion to extradite. Hence, *Valentine* supports the constitutionality of using the Congressional-Executive Agreement to extradite Ntakirutimana. Ntakirutimana attempts to distinguish *Valentine* on the ground that the case dealt with a *treaty* between France and the United States. Yet, *Valentine* indicates that a statute suffices to confer authority on the President to surrender a fugitive. *See id.* Ntakirutimana suggests also that *Valentine* expressly challenged the power of Congress, independent of treaty, to provide for extradition. *Valentine,* however, did not place a limit on Congress's power to provide for extradition. *See id.* at 9, 57 S. Ct. at 102 ("Whatever may be the power of the Congress to provide for extradition independent of treaty . . ."). Thus, although some authorization by law is necessary for the Executive to extradite, neither the Constitution's text nor *Valentine* require that the authorization come in the form of a treaty.

Notwithstanding the Constitution's text or *Valentine,* Ntakirutimana argues that the intent of the drafters of the Constitution supports his interpretation. He alleges that the delegates to the Constitutional Convention intentionally placed the Treaty power exclusively in the President and the Senate. The delegates designed this arrangement because they wanted a single executive agent to negotiate agreements with foreign powers, and they wanted the senior House of Congress—the Senate—to review the agreements to serve as a check on the executive branch. Ntakirutimana also claims that the rejection of alternative proposals suggests that the framers believed that a treaty is the only means by which the United States can enter into a binding agreement with a foreign nation.[12]

We are unpersuaded by Ntakirutimana's extended discussion of the Constitution's history. Ntakirutimana does not cite to any provision in the Constitution or any aspect of its history that requires a treaty to extradite. Ntakirutimana's argument, which is not specific to extradition, is premised on the assumption that a treaty is required for an international agreement. To the contrary, "[t]he Constitution, while expounding procedural requirements for treaties alone, apparently

---

[12] For example, Madison proposed making two types of treaties: one made by the President with the concurrence of the Senate, and the other requiring the concurrence of the whole legislature.

contemplates alternate modes of international agreements." LAURENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW § 4-5, at 228-29 (2d ed. 1988) (explaining that Article 1, § 10 of the Constitution refers to other international devices that may be used by the federal government). "The Supreme Court has recognized that of necessity the President may enter into certain binding agreements with foreign nations not strictly congruent with the formalities required by the Constitution's Treaty Clause." *United States v. Walczak,* 783 F.2d 852, 855 (9th Cir. 1986) (citations omitted) (executive agreement). More specifically, the Supreme Court has repeatedly stated that a treaty or statute may confer the power to extradite. *See, e.g., Valentine,* 299 U.S. at 18, 57 S. Ct. at 106; *Grin v. Shine,* 187 U.S. 181, 191, 23 S. Ct. 98, 102, 47 L. Ed. 130 (1902) ("Congress has a perfect right to provide for the extradition of criminals in its own way, with or without a treaty to that effect, and to declare that foreign criminals shall be surrendered upon such proofs of criminality as it may judge sufficient." (citation omitted)); *Terlinden*, 184 U.S. at 289, 22 S. Ct. at 492 ("In the United States, the general opinion and practice have been that extradition should be declined in the absence of a conventional or legislative provision." (citation omitted)).

Ntakirutimana next argues that historical practice establishes that a treaty is required to extradite. According to Ntakirutimana, the United States has never surrendered a person except pursuant to an Article II treaty, and the only involuntary transfers without an extradition treaty have been to "a foreign country or territory 'occupied by or under the control of the United States.'" *Valentine*, 299 U.S. at 9, 57 S. Ct. at 102. This argument fails for numerous reasons. First, *Valentine* did not suggest that this "historical practice" limited Congress's power. *See id.* at 9, 57 S. Ct. at 102-03. Second, the Supreme Court's statements that a statute may confer the power to extradite also reflect a historical understanding of the Constitution. *See, e.g., id.* at 18, 57 S. Ct. at 106; *Grin,* 187 U.S. at 191, 23 S. Ct. at 102; *Terlinden*, 184 U.S. at 289, 22 S. Ct. at 492. Even if Congress has rarely exercised the power to extradite by statute, a historical understanding exists nonetheless that it may do so. Third, in some instances in which a fugitive would not have been extraditable under a treaty, a fugitive has been extradited pursuant to a statute that "filled the gap"

in the treaty. *See, e.g., Hilario v. United States,* 854 F. Supp. 165 (E.D.N.Y. 1994) (upholding extradition pursuant to a post-*Valentine* statute that granted executive discretion to extradite). Thus, we are unconvinced that the President's practice of usually submitting a negotiated treaty to the Senate reflects a historical understanding that a treaty is required to extradite.

We are unpersuaded by Ntakirutimana's other arguments. First, he asserts that the failure to require a treaty violates the Constitution's separation of powers. He contends that if a treaty is not required, then "the President alone could make dangerous agreements with foreign governments" or "Congress could legislate foreign affairs." This argument is not relevant to an Executive-Congressional agreement, which involves neither the President acting unilaterally nor Congress negotiating with foreign countries. Second, Ntakirutimana argues that "statutes cannot usurp the Treaty making power of Article II." The Supreme Court, however, has held that statutes can usurp a treaty. This is confirmed by the "last in time" rule that, if a statute and treaty are inconsistent, then the last in time will prevail. *See, e.g., Whitney v. Robertson,* 124 U.S. 190, 194, 8 S. Ct. 456, 458, 31 L. Ed. 386 (1888) ("if the two are inconsistent, the one last in date will control the other"). This rule explicitly contemplates that a statute and a treaty may at times cover the same subject matter. Third, Ntakirutimana contends that not requiring a treaty reads the treaty-making power out of the Constitution. Yet, the treaty-making power remains unaffected, because the President may still elect to submit a negotiated treaty to the Senate, instead of submitting legislation to Congress. *See* THE RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW, § 303 cmt. e (1986) ("Which procedure should be used is a political judgment, made in the first instance by the President, subject to the possibility that the Senate might refuse to consider a joint resolution of Congress to approve an agreement, insisting that the President submit the agreement as a treaty."). Thus, we conclude that it is not unconstitutional to surrender Ntakirutimana to the ICTR pursuant to the Executive-Congressional Agreement.

IV

-10-

Ntakirutimana contends next that the district court erred in dismissing his habeas petition because the request for surrender fails to establish probable cause. The Agreement with the ICTR requires that the Tribunal present "information sufficient to establish that there is a reasonable basis to believe that the person sought has committed the violation or violations for which surrender is requested." Agreement, art. 2, cl. 3, 1996 WL 165484, at *1. This requirement is designed to meet our constitutional "probable cause" st andard in reviewing the sufficiency of the evidence in extradition proceedings. In reviewing a request for surrender, the committing court must determine whether probable cause exists to sustain the charges against the accused. *See Collins v. Loisel,* 259 U.S. 309, 314-15, 42 S. Ct. 469, 471, 66 L. Ed. 956 (1922); *Escobedo,* 623 F.2d at 1102. Our function on habeas review "is to determine whether there is any competent evidence tending to show probable cause. The weight and sufficiency of that evidence is for the determination of the committing court." *Escobedo,* 623 F.2d at 1102 (quotations and citations omitted); *cf. Quinn v. Robinson,* 783 F.2d 776, 791 (9th Cir. 1986) ("Because the magistrate's probable cause finding is thus not a finding of fact 'in the sense that the court has weighed the evidence and resolved disputed factual issues,' it must be upheld if there is any competent evidence in the record to support it." (citations omitted)).

The evidence at the extradition hearing consisted of several documents, all of which were admissible.[13] Along with the first request for surrender, the Government included a declaration from Arjen Mostert, who served for six months as a Tribunal investigator. Mostert obtained the declarations of twelve witnesses, labeled A-L to protect their identities, who survived the Mugonero and Bisesero massacres. Mostert declared that the witnesses were ordinary citizens and did not receive consideration for their testimony. The witnesses, all of whom were familiar with Ntakirutimana, described seeing him at the massacre or leading the soldiers in search of Tutsis at

---

[13] There is no dispute that all three declarations have been properly authenticated by either the Ambassador of the United States at Kigali, Rwanda (where the office of the Prosecutor for the Tribunal is located), or the Ambassador of the United States to the Netherlands (where the Tribunal's Prosecutor is based). The authentication renders the documents admissible under 18 U.S.C. § 3190. *See* 18 U.S.C. § 3190 (authentication requirement).

Bisesero.[14] The witnesses' statements corroborated one another, and many of the witnesses positively identified a photograph of Ntakirutimana. When the Magistrate Judge denied the first request for surrender, he found Mostert's affidavit alone insufficient to provide probable cause to support the charges.

In response to the Magistrate Judge's concerns, the Government added a supplemental declaration of Mostert with its second request for surrender.[15] The second request also included the declaration of Pierre-Richard Prosper, the assistant prosecutor for the ICTR. Prosper further clarified the information in Mostert's initial declaration.[16] The district court stated that the supplemental

---

[14] The first indictment is based on evidence from nine witnesses, four of whom knew Ntakirutimana personally. Witnesses B, C, H, and I saw Ntakirutimana among the armed attackers at the Complex massacre. Witness H heard Ntakirutimana say "kill them all" to an attacker. Witness I heard Ntakirutimana tell Tutsis at the Complex, "you are all condemned to die."

The second indictment, which involves the events following the Complex massacre, is based on evidence from five witnesses. Witness C saw Ntakirutimana arrive at a Complex where Tutsis were hiding, and he heard Ntakirutimana tell soldiers to "take off the roof from this church so it cannot be used anymore as a hiding place for these dogs." Witness H corroborated Witness C's recount. Witness I saw Ntakirutimana shoot at Tutsis.

The Appendix to the district court's opinion also provides summaries of the witnesses' statements. *See Ntakirutimana,* 1998 WL 655708, at *33-37.

[15] Mostert's supplemental declaration explained that he used different interpreters for many of the interviews, and that he used the interpreters for a large number of other interviews. He stated that the interpreters appeared to interpret correctly based on several criteria. He also explained that the photograph identification was confirmatory in nature. Mostert showed the photograph of Ntakirutimana to many of the witnesses after they stated that they knew him and had provided a physical description that Mostert believed to be correct.

[16] Prosper provided the following clarifying information. First, many of the witnesses were interviewed several times, and the interviews initially were general and later became more focused. Second, the Office of the Prosecutor for the ICTR has a policy to read back the statement to the witness for accuracy, and all of the witnesses upon whom Mostert relied were subjected to this process. The witnesses all signed their statement and a Witness Acknowledgment Form affirming that the statement is true to the best of their recollection. Third, all witnesses spoke Kinyarwanda, except for Witness B who was interviewed in French by a French-speaking investigator. Prosper stated that the texts of the written statements were proficiently written, and that he personally knew all of the interpreters who performed the final interviews. For each interview, the interpreter signed a certification that he had translated the interview. Fourth, Prosper attested that, based on the information before him, he believed the witnesses to be reliable. He stated that the witnesses are ordinary citizen-victim-eyewitnesses who were speaking of their own personal experiences. They were not informants, their statements corroborated one another, and he had discovered no evidence that a witness had a reason to lie. Fifth, all the witnesses knew or were familiar with Ntakirutimana, who was a chief pastor in the Complex. Ten of the witnesses claimed Seventh Day Adventist as their religion. All of the witnesses

declarations satisfactorily responded to the Magistrate Judge's earlier objections. The district court concluded that probable cause existed to sustain the charges against Ntakirutimana.

Ntakirutimana argues that the district court erred. He contends that the Tribunal has not presented evidence sufficient to show probable cause, because the allegations in Mostert's declarations "lack probative force and are unreliable."[17] Ntakirutimana primarily raises credibility challenges to the evidence against him.[18] Yet, the issue of credibility "is a matter committed to the magistrate and is not reviewable on habeas corpus." *Escobedo,* 623 F.2d at 1102 n.10 (citations omitted); *see also Quinn,* 783 F.2d at 815 ("The credibility of witnesses and the weight to be accorded their testimony is solely within the province of the extradition magistrate." (citation omitted)); *cf. Collins,* 259 U.S. at 316, 42 S. Ct. at 472 (explaining that a petitioner can introduce evidence on probable cause, but cannot introduce evidence in defense, because otherwise the extradition proceeding will become a full hearing and trial of the case); *Eain v. Wilkes,* 641 F.2d 504, 511 (7th Cir. 1981) ("An accused in an extradition hearing has no right . . . to pose questions of credibility as in an ordinary trial, but only to offer evidence which explains or clarifies that proof" (citation omitted)); *Shapiro v. Ferrandina,* 478 F.2d 894, 905 (2d Cir. 1973) (stating that credibility conflict should await trial).

Ntakirutimana asserts that the credibility of the witnesses was not known to the investigators or established by the Tribunal. According to Ntakirutimana, if the witnesses had ties to the Rwandan

---

but one were Tutsi.

[17] Ntakirutimana argues initially that "it is rare for substantive criminal allegations in support of an extradition request to be presented solely in an investigator's affidavit." We deem this objection waived, because Ntakirutimana did not raise the objection at his extradition hearing. *See Lo Duca v. United States,* 93 F.3d 1100, 1111 (2d Cir. 1996) (finding that extraditee waived non-jurisdictional objection by failing to raise the objection at the extradition hearing).

[18] Apart from his credibility challenges, Ntakirutimana briefly attempts to explain his actions. He asserts that, because churches were customary places of sanctuary, there would be nothing sinister for anyone to encourage Tutsis to congregate in the Complex. Yet, this explanation fails to explain most of the allegations against him. Further, Ntakirutimana conceded at the extradition hearing that, without respect to the reliability of the evidence (which has been resolved adversely to Ntakirutimana), the substance of what is reported in the affidavits constitutes probable cause.

government, then the witnesses would have been under pressure to incriminate persons about whom they were questioned. The district court noted, however, that Ntakirutimana provided no specific reason to doubt the credibility of the witnesses. The court stated that the witnesses' statements "enjoy several indicia of reliability," such as the similarity of the witnesses' statements. The court resolved the credibility challenge in the Government's favor. We defer to this conclusion regarding the credibility of the witnesses.[19] *See Escobedo,* 623 F.2d at 1102 n.10.

Ntakirutimana raises the issue of Mostert's credibility, because the signature page of Mostert's first declaration was typed with a different computer than the first twenty-four pages. Ntakirutimana asserts that Mostert could have signed the signature page, and that, after Mostert's employment ended, the page could have been attached to any text. Thus, Ntakirutimana argues, all of Mostert's declarations cannot be taken at face value. The district court rejected this credibility challenge, finding that Mostert's supplemental declaration, in which he avowed that the first declaration was accurate and complete, answered this allegation. As explained previously, we will not revisit this credibility finding. *See Escobedo,* 623 F.2d at 1102 n.10.

Ntakirutimana also challenges the probable cause determination on the ground that the translators were unreliable. The investigators conducted most of their interviews through translators of English and French, the languages of the Tribunal. With the exception of one French-speaking witness, the witnesses spoke Kinyarwanda, Rwanda's native language. Ntakirutimana argues that the translators were not certified or screened for competence or bias, that there was an enormous potential for distortion by the unscreened interpreters, and that there was no way to gauge the accuracy of the translations. The district court declined to address Ntakirutimana's challenge to the reliability of the translations. The court stated that, as long as the evidence is authenticated in

---

[19] Ntakirutimana contends that eyewitness accounts of traumatic events are inherently unreliable, and that the witnesses' statements are undermined by "Rwanda's oral tradition in which Rwandans adopt and confuse what they have seen with what they have been told by others and consider it their personal experience." Ntakirutimana waived this argument by failing to raise it below. *See Lo Duca,* 93 F.3d at 1111.

accordance with § 3190,[20] then it would not consider challenges to the reliability of the translation. We agree with the district court that we can presume that the translations are correct. *See In re Extradition of David,* 395 F. Supp. 803, 806 (E.D. Ill. 1975) ("The Court feels that the translations must be presumed to be correct unless David presents some convincing evidence otherwise."). The extradition court need not independently inquire into the accuracy of the translations submitted with a formal extradition request, because "[s]uch a requirement would place an unbearable burden upon extradition courts and seriously impair the extradition process." *Tang Yee-Chun v. Immundi,* 686 F. Supp. 1004, 1009 (S.D.N.Y 1987). Hence, we decline to address Ntakirutimana's speculations regarding the reliability of the translations.

In short, the district court resolved the credibility challenges adversely to Ntakirutimana, and we will not review those issues. We hold that, based on Mostert's and Prosper's declarations, there is competent evidence in the record to support the district court's finding that the evidence established probable cause to believe that Ntakirutimana committed the crimes charged.

V

Finally, we turn to Ntakirutimana's remaining arguments. Ntakirutimana argues that the U.N. Charter does not authorize the Security Council to establish the ICTR, and that the only method for the U.N. to create an international criminal tribunal is by a multinational treaty. This issue is beyond the scope of habeas review. *See Garcia-Guillern,* 450 F.2d at 1191 (outlining three issues for habeas review); *cf. Terlinden,* 184 U.S. at 289, 22 S. Ct. at 491-92 (stating that it would be impossible for the Executive Department to conduct foreign relations if every court in the country was authorized to inquire and decide whether the person who ratified the treaty on behalf of a foreign nation had the power, by its Constitution and laws, to make the engagements into which he entered). Ntakirutimana contends additionally that the ICTR is incapable of protecting his rights under the United States Constitution and international law. He contends, for example, that the ICTR is incapable of protecting his due process rights and that the ICTR denies the right to be represented by the counsel

---

[20] See *supra* note 13.

of one's choice.  Due to the limited scope of habeas review, we will not inquire into the procedures that await Ntakirutimana.  *See Garcia-Guillern,* 450 F.2d at 1192; *Gallina v. Fraser,* 278 F.2d 77, 79 (2d Cir. 1960) (regarding as significant that the procedures that will occur in the demanding country are not listed within the scope of habeas review); *see also In re Extradition of Manzi,* 888 F.2d 204, 206 (1st Cir. 1989) (explaining the rule of "non-inquiry").  "Such matters, so far as they may be pertinent, are left to the State Department, which ultimately will determine whether the appellant will be surrendered to the [ICTR]."  *Garcia-Guillern,* 450 F.2d at 1192.

## VI

For the foregoing reasons, we AFFIRM the order of the district court denying Ntakirutimana's petition for a writ of habeas corpus, and LIFT the stay of extradition.

ROBERT M. PARKER, Circuit Judge, writing separately, special concurrence.

Judge Garza has crafted for the panel a well-written opinion that faithfully adheres to controlling jurisprudence, and thereby has earned my concurrence. I write separately and briefly to invite the Secretary to closely scrutinize the underlying evidence as she makes her decision regarding whether Ntakirutimana should be surrendered to the International Criminal Tribunal for Rwanda. The evidence supporting the request is highly suspect. Affidavits of unnamed Tutsi witnesses acquired during interviews utilizing questionable interpreters in a political environment that has all the earmarks of a campaign of tribal retribution raises serious questions regarding the truth of their content.

It defies logic, and thereby places in question the credibility of the underlying evidence, that a man who has served his church faithfully for many years, who has never been accused of any law infraction, who has for his long life been a man of peace, and who is married to a Tutsi would somehow suddenly become a man of violence and commit the atrocities for which he stands accused. I fully understand that the ultimate decision in this case may well be a political one that is driven by important considerations of State that transcend the question of guilt or innocence of any single individual. I respect the political process that necessarily is implicated in this case, just as I respect the fact that adherence to precedent compels my concurrence.

To the extent that it may be relevant to the Secretary's decision, I merely add, based on all the information in this record, viewed from the perspective of a judge who has served fifteen years on the trial bench and five years on the court of appeals, that I am persuaded that it is more likely than not that Ntakirutimana is actually innocent.

HAROLD R. DeMOSS, Circuit Judge, dissenting:

Our Constitution is the result of a deliberate plan for the separation of powers, designed to prevent both the arrogation of authority and the potential for tyranny. Notwithstanding our nation's moral duty to assist the cause of international justice, our nation's actions taken in that regard must comport with the Constitution's procedures and with respect for its allocation of powers. That is why we claim to be a nation ruled by law rather than men.

The Attorney General's litigation position in this case has apparently been chosen for the purpose of validating a constitutional shortcut which would bypass the Treaty Clause. She stakes her case on the validity and enforceability of a warrant issued by the United Nations International Criminal Tribunal for Rwanda, which is a nonsovereign entity created by the United Nations Security Council, purporting to "DIRECT" the officials of our sovereign nation to surrender the accused. In defense of this, the Attorney General relies exclusively on what my colleagues have termed a "Congressional-Executive Agreement" -- the coincidence of an "executive agreement" with the Tribunal, entered on behalf of the United States by an ambassador appointed by the President in the course of his duties to conduct foreign affairs, and a purported enabling act passed by simple majorities of both houses of Congress and signed into law by the President.

A structural reading of the Constitution compels the conclusion that most international agreements must be ratified

according to the Treaty Clause of Article II.  The history of national and international practice indicate that extradition agreements fall into this category.  Our Founding Fathers intended that the President have authority to negotiate such agreements, but also that they be ratified pursuant to a special process intended to set a higher standard of legislative agreement than that required for ordinary legislation.  The Constitution thus provides a plain procedure for entering into a treaty, which requires the assent of the President and two-thirds of the Senate.  That procedure was not followed with respect to the executive agreement to extradite fugitives to the International Criminal Tribunal for Rwanda, and the procedure is not satisfied by the combination of an executive agreement and ordinary legislation.  For this reason, I respectfully dissent from the majority's conclusion that the Constitution permits the extradition of Elizaphan Ntakirutimana based upon a foreign warrant invoking an executive agreement and its implementing statute.

**I.**

The Attorney General seeks to surrender Elizaphan Ntakirutimana to the International Criminal Tribunal for Rwanda based on three legal authorities.  The first of these authorities is an executive agreement, the "Agreement on Surrender of Persons" between the United States and the Tribunal (hereinafter,

Surrender Agreement).[21] The Surrender Agreement was signed on behalf of the United States by the American ambassador to The Netherlands, and it purports to satisfy "the obligation of the United States, pursuant to the Statute of the Tribunal adopted by United Nations Security Council Resolution 955 . . . to surrender accused or convicted persons to the Tribunal." Surrender Agreement, 1996 WL 165484, at *1. United Nations Security Council Resolution 955 requires that "all States shall cooperate fully with the International Tribunal and its organs in accordance with the present resolution and the Statute of the International Tribunal" and "all States shall take any measures necessary under their domestic law to implement the provisions of the present resolution and the Statute, including the obligation of States to comply with requests for assistance or orders issued by a Trial Chamber under Article 28 of the Statute."[22] Accordingly, the Surrender Agreement provides that:

> The United States agrees to surrender to the Tribunal, pursuant to the provisions of this Agreement and the Statute, persons, including United States citizens, found in its territory whom the Tribunal has charged with or found guilty of a violation or violations within the competence of the Tribunal as defined in the Statute.

Surrender Agreement, art. I, § 1, 1996 WL 165484, at *1.

---

[21]   *See* Agreement on Surrender of Persons Between the Government of the United States and the International Tribunal for the Prosecution of Persons Responsible for Genocide and Other Serious Violations of International Humanitarian Law Committed in the Territory of Rwanda and Rwandan Citizens Responsible for Genocide and Other Such Violations Committed in the Territory Of Neighbouring States, Jan. 24, 1995, U.S.-ICTR, *available in* 1996 WL 165484.

[22]   Res. 955, U.N. SCOR, 49th Sess., 3453d mtg. at 2, U.N. Doc. S/RES/955 (1994), *available in ICTR - Resolutions of the Security Council* (visited July 26, 1999) <http://www.un.org/ ictr/english/Resolutions/955e.htm>.

The second authority is an act of Congress, the National

Defense Authorization Act for Fiscal Year 1996 (the Act), Pub. L.

No. 104-106, § 1342, 110 Stat. 186, 486.  Section 1342 provides,

in pertinent part:

> [T]he provisions of chapter 209 of title 18,
> United States Code [18 U.S.C. § 3181 et seq.],
> relating to the extradition of persons to a
> foreign country pursuant to a treaty or convention
> for extradition between the United States and a
> foreign government, shall apply in the same manner
> and extent to the surrender of persons, including
> United States citizens, to . . . (B) the
> International Tribunal for Rwanda, pursuant to the
> Agreement Between the United States and the
> International Tribunal for Rwanda.

Pub. L. No. 104-106, § 1342(a), 110 Stat. 186, 486 (1996),

*reprinted in* 28 U.S.C.A. § 3181 note at 214 (West Supp. 1999).

Section 1342(a) has a curious history.  First, the provision

obviously bears no relation by subject matter to the general

theme of the Act in which it was enacted, which was matters

pertaining to the national defense.  Predictably, then, no

language bearing any relation to this provision can be found in

the original bills proposed in the House of Representatives and

Senate for the 104th Congress.[23]  The first suggestion about a

provision permitting extradition to the International Criminal

Tribunals came in the form of a floor amendment offered by

Senator Arlen Specter of Pennsylvania.  The Specter Amendment,

---

[23]  *See* S. 1026, 104th Cong. (1995); *available in* U.S. Gov't Printing Office, *GPO Access* (hereinafter, *GPO Access*) (visited July 27, 1999) <http://frwebgate.access.gpo.gov/cgi-bin/getdoc.cgi?dbname=104_cong_bills&docid=f:s1124pcs.txt.pdf>; H.R. 1520, 104th Cong. (1995), *available in GPO Access* (visited July 27, 1999) <http://frwebgate.access.gpo.gov/cgi-bin/getdoc.cgi?dbname=104_cong_bills&docid=f:h1530ih.txt.pdf>.

No. 2081, supplied the language which was ultimately enacted as § 1342 of the Act.[24] Senator Specter indicated that this amendment contained legislation which was being sought by the President,[25] and with this assurance (and without further discussion), the leadership of the Senate accepted the amendment.[26] In conference, the House receded to the Specter Amendment "with a technical amendment." H.R. Conf. Rep. No. 104-450 (1996), *reprinted in* 1996 U.S.C.C.A.N. 238, 391. Subsection (a)(1) of the Specter Amendment (ultimately Pub. L. 104-106, § 1342(a)(1), the provision at issue in this appeal) was not altered. The conference report was accepted by the Senate on a 56-34 vote and by the House of Representatives on a 287-129 vote. Public Law 104-106 was subsequently signed by President Clinton, and the Specter Amendment thereby got slipped into law through

---

[24] *See* 142 Cong. Rec. S11218 (daily ed. Aug. 2, 1995), *available in GPO Access* (visited July 27, 1999) <http://frwebgate. access.gpo.gov/cgi-bin/getpage.cgi?dbname=1995_record&page=S11218&position=all>.

[25] *See* 141 Cong. Rec. S10316 (daily ed., July 19, 1995), *available in GPO Access* (visited July 27, 1999) <http://frwebgate.access.gpo.gov/cgi-bin/getpage.cgi?position=all&page=S10316&dbname=1995 _record> (noting referral to the Committee on the Judiciary of a "communication from the Assistant Attorney General, Office of Legislative Affairs, transmitting, a draft of proposed legislation to enable the United States to meet its obligations to surrender offenders and provide evidence to . . . the International Criminal Tribunal for the Prosecution of Persons Responsible for Genocide and Other Serious Violations of Humanitarian Law Committed in the Territory of Rwanda and Citizens Responsible for Genocide and other such Violations Committed in the Territory of Neighboring States"); 141 Cong. Rec. H7010 (daily ed., July 13, 1995), *available in GPO Access* (visited July 27, 1999) <http://frwebgate.access.gpo.gov/cgi-bin/getpage.cgi?position=all&page=H7009&dbname=1995_ record> (same).

[26] *See* 141 Cong. Rec. S11422 (Aug. 4, 1995), *available in GPO Access* (visited July 27, 1999) <http://frwebgate.access.gpo. gov/cgi-bin/getpage.cgi?position=all&page=S11422&dbname=1995_ record>.

the back door, without any public discussion or debate about its substantive merits.

Although it relates to foreign relations and performs a function historically performed by treaties, the Specter Amendment (§ 1342) did not originate in the Senate Foreign Relations Committee,[27] and no hearings or deliberations of any sort were ever held by that committee on the subject of extradition to the international criminal tribunals established by the United Nations Security Council.  Likewise, although § 1342 relates to extradition procedures in United States courts, it was never considered by the Senate Judiciary Committee.[28] Most curiously, the provision does not purport to be an amendment to the existing statutes on extradition and it was not codified. It appears in the *United States Code Annotated* only as a "statutory note" -- a literal afterthought.  If the ratification of an extradition agreement is a legislative function which our Founding Fathers intended to be performed under the Treaty Clause, the history of the passage of § 1342 stands in stark contrast to that heightened legislative standard.  It was a parasite on the defense spending authorization bill, the ultimate passage of which never could have been questioned.  Like one of

___

[27]   The jurisdiction of the Foreign Relations Committee includes, among other things, "[r]elations of the United States with foreign nations generally" and "[t]reaties and executive agreements."  Sen. Foreign Relations Committee Rule 1(a), *available in GPO Access* (visited July 27, 1999) <http://www.access.gpo.gov/ congress/senate/srules11.txt>.

[28]   The jurisdiction of the Judiciary Committee includes, among other things, "[f]ederal courts and judges" and "[j]udicial proceedings, civil and criminal, generally."  U.S. Senate Judiciary Comm., *Jurisdiction* (visited July 27, 1998) <http://www.senate. gov/~judiciary/jurisdic.htm>.

our B-2 stealth bombers, it slipped through the radar net of the legislative process without the public awareness, debate, and consideration normally given to legislation of this importance.

The third authority invoked by the Attorney General is a warrant issued by the United Nations International Criminal Tribunal for Rwanda, located in Arusha, Tanzania.  The warrant reads, in pertinent part: "I, Judge William H. Sekule, Judge of the International Criminal Tribunal for Rwanda . . . HEREBY DIRECT the Authorities of the United States of America to search for, arrest and surrender to the International Criminal Tribunal for Rwanda: Elizaphan Ntakirutimana . . . . [who is] currently believed to be in the United States of America." *Prosecutor v. Ntakirutimana*, No. ICTR-96-17-1 (U.N.I.C.T.R. Sept. 7, 1996) (warrant of arrest and order for surrender).  The Tribunal is not a sovereign nation.

## II.

The "Congressional-Executive Agreement" method of ratifying the Surrender Agreement with the Tribunal runs afoul of the Constitution's Treaty Clause, and § 1342 alone is constitutionally insufficient to ratify the Surrender Agreement which has been invoked to support the extradition.

## A.

Article II, § 2 of the Constitution provides:

> The President shall be Commander in Chief of the Army and Navy of the United States, and of the

-25-

Militia of the several States, when called into
the actual Service of the United States; he may
require the Opinion, in writing, of the principal
Officer in each of the executive Departments, upon
any Subject relating to the Duties of their
respective Offices, and he shall have Power to
grant Reprieves and Pardons for Offenses against
the United States, except in Cases of Impeachment.

He shall have Power, by and with the Advice
and Consent of the Senate, to make Treaties,
provided two thirds of the Senators present
concur; and he shall nominate, and by and with the
Advice and Consent of the Senate, shall appoint
Ambassadors, other public Ministers and Consuls,
Judges of the supreme Court, and all other
Officers of the United States, whose Appointments
are not herein otherwise provided for, and which
shall be established by Law: but the Congress may
by Law vest the Appointment of such inferior
Officers, as they think proper, in the President
alone, in the Courts of Law, or in the Heads of
Departments.

The President shall have Power to fill up all
Vacancies that may happen during  the Recess of
the Senate, by granting Commissions which shall
expire at the End of their next Session.

U.S. Const. art. II, § 2.  The Congressional-Executive Agreement

did not conform to this procedure.  Not only was ordinary

legislation passed in lieu of the Senate's advice and consent,

but also the required threshold for passage in the Senate of

approval by two-thirds was not achieved.

The Constitution's treaty procedure must be followed in

order to ratify an extradition agreement which contractually

binds our nation to respect obligations to another nation.  The

intent of the framers could not be clearer on this point.  Our

Founding Fathers were very concerned about the new nation

becoming entangled in foreign alliances.  The possibility of

giving the President full authority for foreign affairs was

-26-

considered and rejected.  In *The Federalist No. 75*, Alexander Hamilton argued that it would be "utterly unsafe and improper" to completely entrust foreign affairs to a President, who is elected for only four years at a time.  The Founders were especially concerned with the possibility that, in the conduct of foreign policy, American officials might become seduced by their foreign counterparts or a President might actually betray the country.  Thus, while primary responsibility for foreign affairs was given to the President, a significant restraint and "check" on the use of the treaty power was created by requiring for treaties the advice and consent of two-thirds of the Senate.  *See The Federalist No. 69* (Alexander Hamilton) (noting that this "check" is a major distinction between the presidency and England's monarchy, in which the king was "the sole and absolute representative of the nation in all foreign transactions").  The decision to require approval of two-thirds of Senators was controversial and hotly debated, but it was ultimately decided that sheer importance of the treaty power merited such a treatment.  Treaties cannot be accomplished by any means other than the Article II treaty ratification procedure.

Of course, not all agreements with foreign countries require the full Article II "treaty" treatment in order to be effective.  The Constitution implicitly recognizes a hierarchy of arrangements with foreign countries, of which treaties are the most sacrosanct.  *Compare* U.S. Const. art. I, § 10, cl. 1 ("No State shall enter into any Treaty, Alliance, or

-27-

Confederation . . . ."), *with* U.S. Const. art. I, § 10, cl. 3 ("No State shall, without the Consent of Congress . . . enter into any Agreement or Compact with another State, or with a foreign Power . . . ."). The Attorney General's primary argument in defense of the enforceability of the extradition agreement with the Tribunal follows this line of thought. She has argued, and the majority echoes (*see* Majority Op. at 7), that the Constitution contains no explicit reference to extradition.

But the fact of the matter is that while the Constitution has no provisions explicitly relating to extradition, it likewise has no provisions explicitly relating to executive agreements. It only mentions treaties. Our national government is one of limited, enumerated powers. *See, e.g.*, *United States v. Lopez*, 514 U.S. 549, 551, 115 S. Ct. 1624, 1626 (1995) (quoting *The Federalist No. 45* (James Madison)); *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 176-77 (1803). All agree that the Surrender Agreement is not a treaty. We are therefore left to read between the lines to ascertain whether the President and Congress have wrongfully attempted by ordinary legislative procedures, to exercise a power governed by the Treaty Clause or whether some source of power other than the Treaty Clause enables the President and Congress to bind the country to the Surrender Agreement.

Our inquiry is significantly informed by a demonstration of what specific powers are encompassed by the Treaty Clause. "A treaty is in its nature a contract between two nations, not a

legislative act."  *Foster v. Neilson*, 27 U.S. (2 Pet.) 253, 314 (1829); *see also Edye v. Robertson (Head Money Cases)*, 112 U.S. 580, 598-99, 5 S. Ct. 247, 254 (1884).  Alexander Hamilton explained:

> The power of making treaties . . . relates neither to the execution of the subsisting laws, nor to the enaction of new ones; and still less to an exertion of the common strength.  Its objects are CONTRACTS with foreign nations, which have the force of law, but derive it from the obligations of good faith.  They are not rules prescribed by the sovereign to the subject, but agreements between sovereign and sovereign.

*The Federalist No. 75*.  It is precisely the position of the Attorney General that the Surrender Agreement is a valid contract with a foreign authority and that it has the force of law.  In Alexander's day, an agreement with those characteristics was called a treaty.

If the Treaty Clause is to have any meaning there is some variety of agreements which *must* be accomplished through the formal Article II process.  Otherwise, the heightened consideration dictated by Article II could be avoided by the President and a majority of Congress simply by substituting the label of "executive agreement" for that of "treaty."  The Supreme Court has recognized this principle:

> Express power is given to the President, by and with the advice and consent of the Senate, to make treaties, provided two-thirds of the senators present concur, and inasmuch as the power is given, in general terms, without any description of the objects intended to be embraced within its scope, *it must be assumed that the framers of the Constitution intended that it should extend to all those objects which in the intercourse of nations had usually been regarded as the proper subjects*

-29-

> *of negotiation and treaty*, if not inconsistent
> with the nature of our government and the relation
> between the States and the United States.

*Holden v. Joy*, 84 U.S. (17 Wall.) 211, 242-43 (1872) (emphasis supplied).

Plainly, an extradition agreement is a type of agreement historically found in a treaty and therefore governed by the Treaty Clause. Extradition, which is defined as "the surrender by one nation to another of an individual accused or convicted of an offense outside of its own territory, and within the territorial jurisdiction of the other, which, being competent to try and to punish him, demands the surrender," *Terlinden v. Ames*, 184 U.S. 270, 289, 22 S. Ct. 484, 492 (1902), has usually been regarded as the proper subject of negotiation and treaty. Historically, the United States has not surrendered a person to a foreign authority (excluding countries or territories controlled by the United States) in the absence of a valid extradition treaty.[29] Every extradition agreement ever entered into by the United States (before the advent of the new Tribunals) has been accomplished by treaty, including the Jay Treaty (1795) and the Webster Ashburton Treaty (1842). The original extradition statutes, enacted in 1848, required the existence of an extradition treaty, and there was no exception until § 1342 was passed to accommodate the Tribunals for Rwanda and the former Yugoslavia. Furthermore, "the principles of international law

---

[29] The Attorney General cites only one historical example of such an extradition, but explicitly refrains from opining as to whether that extradition was validly accomplished.

recognize no *right* to extradition apart from treaty." *Factor v. Laubenheimer*, 290 U.S. 276, 287, 54 S. Ct. 191, 193 (1933).

The insistence on the use of the treaty power for certain types of international agreements comports with the Founding Fathers' intention that the President not have unfettered discretion to enter agreements with foreign nations. *See The Federalist No. 75* (Alexander Hamilton). Unless the Article II procedure is insisted upon, the President can exercise such plenary power simply by denominating his agreements as something other than "treaties." *See* Laurence H. Tribe, *Taking Text and Structure Seriously: Reflections on Free-form Method in Constitutional Interpretation*, 108 *Harv. L. Rev.* 1221, 1273 & n.179 (1995); *cf. Freytag v. Commissioner*, 501 U.S. 868, 880, 111 S. Ct. 2631, 2639 (1991) ("Neither Congress nor the Executive can agree to waive this structural protection [of the Appointments Clause] . . . . The structural interests protected by the Appointments Clause are not those of any one Branch of government but of the entire Republic."); *Weiss v. United States*, 510 U.S. 163, 189, 114 S. Ct. 752, 766 (1994) (Souter, J., concurring) (same).

Notably, the United States has publicly declared to the entire world that it can only enter into an extradition agreement through a treaty. In its fifth reservation to the Convention on the Prevention and Punishment of the Crime of Genocide, Dec. 9, 1948, 78 U.N.T.S. 277, the United States proclaimed to the international diplomatic community that it "reserves the right to

effect its participation in any such tribunal only by a treaty entered into specifically for that purpose with the advice and consent of the Senate."[30]  There is no treaty which has been entered into "with the advice and consent of the Senate" which authorizes the participation in the Tribunal by the United States.  This reservation clearly evidences the intent and expectation of the United States that the only way its participation in the Tribunal could take place was by a duly negotiated and ratified treaty on that subject.  A reading of the Treaty Clause of the Constitution which permits the semantic shenanigans suggested by the Attorney General is an insult to the intricate structure of the Constitution, which seeks to avoid tyranny and ensure democracy through a deliberate separation of power and a delicate system of checks and balances.  *See, e.g.*, *Gregory v. Ashcroft*, 501 U.S. 452, 458, 111 S. Ct. 2395, 2400 (1991); *The Federalist No.* 28 (Alexander Hamilton); *The Federalist No.* 51 (James Madison).  In contrast, § 1342(a) came into being without hearings by any committee of the Congress, without a committee report from any committee of Congress, and without any debate on the floor of the Senate or the House of Representatives as to the substance of its provision.  I therefore am compelled to conclude that Ntakirutimana may not be

---

[30]    United States Reservations to the Convention on the Prevention and Punishment of the Crime of Genocide (Nov. 25, 1988), *available in* United Nations, *United Nations Treaty Collection Web Site* (visited July 27, 1999) <www.un.org/Depts/Treaty/final/ts2/newfiles/part_boo/iv_boo/iv_1.html>.

constitutionally surrendered because of the failure of the executive and legislative branches to comply with Article II.[31]

**B.**

The Attorney General and my colleagues in the majority place great reliance on *Valentine v. United States ex rel. Neidecker*, 299 U.S. 5, 57 S. Ct. 100 (1936), in which the Court stated: "It cannot be doubted that the power to provide for extradition is a national power; it pertains to the national government and not to the states. But, albeit a national power, it is not confided to the Executive in the absence of treaty or legislative provision." 299 U.S. at 8, 57 S. Ct. at 102 (internal citation omitted). *Valentine* was a case that did involve a treaty -- its stray reference to "legislative provision" is pure dicta, and certainly not a plain holding that extradition may be accomplished by the President simply on the basis of congressional approval. Likewise, in *Terlinden v. Ames*, 184 U.S. 270, 22 S. Ct. 484 (1902), in which the Court noted that "[i]n the United States, the general opinion and practice have been that extradition should be declined in the absence of a conventional or legislative provision," 184 U.S. at 289, 22 S. Ct. at 492, there was also a valid extradition treaty, and the reference to a "legislative provision" is again dicta.

---

[31] *See Then v. Melendez*, 92 F.3d 851, 853 (9th Cir. 1996) ("The advice and consent of the Senate is a constitutional prerequisite to a valid treaty, and the executive branch does not have the power to extradite alleged criminals absent a valid extradition treaty.") (dicta); *Gouveia v. Vokes*, 800 F. Supp. 241 (E.D. Pa. 1992) (extradition must be authorized by a treaty).

The Attorney General insists that the President has the power to unilaterally enter an extradition agreement with foreign nations, the only distinction between that variety of agreement and an Article II treaty being that only a treaty will impose upon the President a duty to extradite. In defense of this principle, the Attorney General points to *Factor v. Laubenheimer*, 290 U.S. 276, 54 S. Ct. 191 (1933), which states:

> While a government may, if agreeable to its own constitution and laws, voluntarily exercise the power to surrender a fugitive from justice to the country from which he had fled, and it has been said that it is under a moral duty to do so, the legal right to demand his extradition and the correlative duty to surrender him to the demanding country exist only when created by treaty.

290 U.S. at 286, 54 S. Ct. at 192 (internal citation omitted); *see also United States v. Rauscher*, 119 U.S. 407, 7 S. Ct. 234 (1886).

But these cases do not support the Attorney General's position. The quoted passage stands for the unremarkable propositions that a sovereign nation can (and perhaps should), if consistent with its own laws, surrender to another sovereign nation one of the surrendering nation's own citizens who is accused of crimes by that other sovereign nation, but that no such duty or legal obligation arises absent a treaty. Those propositions do not mean that the President, acting unilaterally, can enter non-binding executive agreements to extradite,[32] or that Congress may ratify such an agreement. The Attorney General

_____

[32] *See Valentine*, 299 U.S. at 17, 57 S. Ct. at 106; M. Cherif Bassiouni, *International Extradition: United States Law and Practice* 67 (3d ed. 1996).

does not purport to act pursuant to some sort of sovereign power to surrender Ntakirutimana; she has consciously premised her argument on the validity and enforceability of the Surrender Agreement. This is plain from the briefs filed in this Court.[33] Given that the Surrender Agreement is the authority invoked by the Attorney General, it is the authority which we must consider.

## III.

The executive and legislative branches of government erroneously disregarded their obligation to respect the structure provided by the Constitution when they purported to enter this extradition agreement.[34] We should issue a writ of habeas corpus, and Ntakirutimana should not be surrendered. The extradition agreement in place between the United States and the Tribunal is unenforceable, as it has not been properly ratified. The agreement's implementing legislation is unconstitutional insofar as it purports to ratify the Surrender Agreement by a means other than that prescribed by the Treaty Clause. The two acts seek impermissibly to evade the mandatory constitutional

---

[33] A recent news story made this point clear, reporting: "Federal prosecutors handling the [Ntakirutimana] case say the United States has a valid contract with the United Nations to enforce resolutions of the U.N. Security Council." *U.S. Appeals Court to Hear Extradition Case of Rwandan Pastor*, AP, Mar. 11, 1999, *available in* LEXIS, News Library, Wires File.

[34] It is not true, as has been suggested in the media, that "[i]f Mr. Ntakirutimana's constitutional argument prevails, it will diminish the ability of the United States to cooperate in international war crimes prosecutions." *War Crimes and Extradition*, Wash. Post, Apr. 10, 1999, at A20, *available in* 1999 WL 2210242. All that is required for participation is conformance with the Constitution. If the President wishes to bind the United States to an agreement such as the Surrender Agreement, he must obtain the advice and consent of two-thirds of the Senate as provided in Article II.

route for implementing such an agreement.[35]   I therefore

respectfully dissent.[36]

---

[35]   Whether executive and legislative actions such as those giving rise to this case reflect, as political commentator George Will has suggested, a disturbing trend of "dilution of American democracy," I leave for others to judge.  George Will, *See You in Congress . . .*, Wash. Post, May 20, 1999, at A29, *available in* 1999 WL 17003981 *and* Sacramento Post, *Sacbee Voices - George Will* (visited July 27, 1999) <http://www.sacbee.com/voices/national/will/will_19990520.html>.

[36]   Ntakirutimana challenges the Tribunal itself as an ultra vires creation of the United Nations Security Council.  His
is not a novel argument -- the authority of the ad hoc Tribunals for Rwanda and the former Yugoslavia has been hotly debated in academia, *see, e.g.*, Tara Sapru, Comment, *Into the Heart of Darkness: The Case Against the Foray of the Security Council Tribunal into the Rwandan Crisis*, 32 *Tex. Int'l L.J.* 329, 339 (1997), rejected by Rwanda's neighbors who refuse to accept the ICTR's process, and fully litigated in the Tribunal for the former Yugoslavia.  To the extent that the viability of the Tribunal is a legitimate subject of foreign policy within the realm of the Executive, separation-of-powers concerns justify our Court in abstaining from the political question of the Tribunal's authority.  *See Baker v. Carr*, 369 U.S. 186, 210-11, 82 S. Ct. 691, 706 (1962); *see generally* 13 Charles Alan Wright et al., *Federal Practice and Procedure* § 3529 (2d ed. 1984).